SUSAN LYNN MAGUIRE, a minor, by JUNE M. MAGUIRE, her mother and next friend, Plaintiff-Appellant, *v.* WAUKEGAN PARK DISTRICT, Defendant-Appellee.

(No. 71-75;

Second District—April 17, 1972.

*Rehearing denied May 18, 1972.*

Hartnett & Pease, of Waukegan, for appellant.

Hall, Meyer, Fisher, Holmberg, Snook & May, of Waukegan, (Charles M. May, of counsel,) for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Susan Lynn Maguire, a minor, by her mother and next friend, brought an action against the defendant Park District and the City of Waukegan for damages sustained when the toboggan on which she was riding struck a culvert in Bowen Park. The City was dismissed as the result of a pre-trial settlement. The jury rendered a verdict awarding the minor plaintiff $7,500 for injuries and future medical expenses as against the Park District but denied recovery for past medical expenses incurred by plaintiff's parents and sought by plaintiff as their assignee. The court entered judgment on the verdicts, crediting $5,000 received from the City in exchange for the covenant not to sue.

Plaintiff's post-trial motion for a new trial, or in the alternative for an additur to the judgment, or as an additional alternative a new trial as to damages only, was denied. The denial of the post-trial motion was appealed in its entirety but plaintiff has limited her argument here to the issue of whether the verdict was inadequate and whether such inadequacy was occasioned by improper argument of counsel and the introduction of improper evidence. No cross-appeal has been taken by the defendant from the trial court's denial of the defendant's motion for a new trial.

On January 17, 1965, the Maguires, accompanied by the minor plaintiff and her brother, took their toboggan to the area of Bowen Park opposite their home. After a 45 or 50 foot slide down a slope in the Park, the toboggan came to an abrupt stop. Upon investigation the parents found that the toboggan had struck a culvert covered by leaves and snow. They also determined that the plaintiff was injured, and proceeded to take her to the hospital.

Dr. E. William Immermann, an orthopedic surgeon, testified that he examined the plaintiff on her arrival at Highland Park Hospital and

found that her left hip was dislocated and her left leg was fractured below the knee. There was bleeding where the bone was sticking out of the skin. Blood was found in the urine specimen from which the Doctor concluded that the bleeding was the result of trauma of the bladder. Surgery was performed the day of the accident. A 5 or 6 inch incision was made on the side of the thigh, and the hip dislocation was reduced by manipulation. The left femur was fractured at 2 points resulting in 3 bone segments. The wound was then closed and irrigated. A cast was applied covering the entire area from the nipples to the pelvis and down the left leg to the ankle. The plaintiff was hospitalized for 13 days at this time and again for 3 days in November of the same year to have the rod surgically removed. At the time of the second hospitalization plaintiff had a large keloid scar on the left thigh which Dr. Immermann excised on either side and made an incision to take it out. The Doctor again saw the child on February 5, 1969, which was about a week before trial, and said that she then walked with some toeing out on the left side and that the left leg was ⅜ths to ½ inch longer than the right leg. He concluded that this was due to both elongation of the tibia and a thickening of the femur which has resulted in a pelvic tilt and a spinal scoliosis. He found that the circulation of the hips was intact and that the child's only complaint was of aching and cramps in the legs. Dr. Immermann stated that both the leg length and the curvature of the leg "may or may not be" permanent and that she may need a corrective shoe at night to correct the toeing out. His estimate of future medical expenses for his services, as his testimony appears in the record, was, "The maximum would be $2,300, something like that." His bill to that date was $2,870.

Dr. Frank W. Pirrucello, a plastic surgeon, testified that he examined plaintiff on May 7, 1965. He found that she had an extensive linear scar running down the thigh and the side of the leg in excess of 4 inches in length and approximately ⅓rd inch in width. There was another scar above this area which was perhaps less than an inch in length. Both scars were raised, irregular, and very red. The Doctor characterized the larger scar as hypertrophic bordering on keloidal. He defined hypertrophic as a scar which is an excessive response to injury and almost within normal range contrasted with a keloid which continues to grow and tends to invade under the skin. He found evidence of blood vessels penetrating the scars, indicating that the scars were still active and continuing to grow. Since operating on an active scar would tend to stimulate it, the Doctor felt that it could not be attempted until the scar was more mature, which might take an indeterminate period depending on the child's maturation. X-ray treatments would possibly have to be used in the removal. The removal would be in 3 stages, each involving

surgery under general anesthesia and a minimum of 2 days hospitalization. After each stage the child would be immobilized for 10 days to 2 weeks, and kept from physical exercise for approximately 1 month. Removal of the scar could only be partial, and some permanent scarring would remain. Dr. Pirrucello again examined that plaintiff on May 20, 1966, on June 1, 1967 and November 11, 1968. Testifying at the trial, he said that, based upon the last visit with the child, he would estimate that it would be anytime from 2 to 10 years before he would begin the surgical intervention. His estimate of future fees including surgical, anesthesiologist and hospital fees amounted to a total of $1,542, which contemplated a minimum of 6 days in the hospital.

June Maguire, the plaintiff's mother, testified that plaintiff spent two days in intensive care after surgery, and for the first week she just "whimpered" and complained of pain in her legs. After returning home, plaintiff had to be fed because she couldn't turn her body into a proper position to feed herself. At night she had nightmares and screamed and hollered. When the cast was removed she had to learn to walk with a walker. At the time of trial the child still complained that her legs hurt her, depending on how active she was. However, at this time she could ride a bicycle and walk the two blocks from her home to school.

■■ The compensation to be awarded for personal injuries is a question of fact for the jury. If the jury has been correctly instructed as to the elements measuring damages and if there is no showing that the size of the verdict is the result either of passion or prejudice or the result of the jury having overlooked an element of damages, then the amount awarded will not be disturbed on review. (*Lazzaro v. Garrett* (1968), 100 Ill.App.2d 452, 456; *Wisnawski v. Hungerford* (1971), (Ill. App.3d), 267 N.E.2d 507, 510.) To order a new trial solely on the issue of damages, it must appear that the damage issue is so separable and distinct from the issue of liability that a new trial to determine damages alone may be had without injustice. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill.2d 28, 46.) Therefore, no new trial on damages only may be ordered where it appears that the verdict was the result of a compromise on the question of liability. *Paul Harris Furniture Co. v. Morse, supra,* at page 46; *First Nat. Bank of Elgin v. Szwankowski* (1969), 109 Ill.App.2d 268, 274.

While the issue of liability was strongly contested in the trial court, the record discloses sufficient evidence for the jury to find the defendant liable. Therefore, we are unable to say with any certainty that the verdict was the result of a compromise on the liability question.

■■ However, we do not find the verdict of $7,500 so palpably inadequate as to justify our interference. The jury was properly instructed as

to the elements of damage, and there is no showing that any element has been overlooked. The verdict is greater than the total of the past medical expenses of $4,365.74 paid by the parents (which the jury refused on the assignment) and the future medical expenses of approximately $1,800. There is no such permanency of injury as would bring the case within *First Nat. Bank of Elgin v. Szwankowski, supra,* page 272, 276. While the verdict was not high, and another finder of fact might reach a different result, we cannot say that it was so inadequate that the province of the jury should be invaded.

■■ Plaintiff has also argued that the closing argument by defendant's counsel was so improper that it constituted reversible error even though much of it was not objected to. Plaintiff contends that counsel argued medical matters not in evidence when he told the jury that Dr. Immermann testified that he could not say that nature would not correct the scoliosis or correct the femur length. Counsel cannot state matters not in evidence, but can urge all reasonable inferences and conclusions which may be properly drawn from the evidence and wide latitude should be allowed. (*Mattice v. Klawans* (1924), 312 Ill. 299, 309; *Anderson v. Universal Delta* (1967), 90 Ill.App.2d 105, 111; *Tuskey v. Callos* (1969), 112 Ill.App.2d 213, 219; *Forslund v. Chicago Transit Authority* (1956), 9 Ill. App.2d 290, 305.) While counsel's statement was not an exact quote, there is testimony of the Doctor which indicates that some self-correction of the condition could be expected. The comment may be said to be based on the testimony, and there was no objection.

■■ Similarly, counsel's suggestion that the insertion of a lift in the shoe could correct this scoliotic condition was gratuitous and not based on any medical testimony in the record. However, it seems an argument which is basically directed toward the common experience of the jurors that would have little prejudicial effect. We cannot assume that the jurors credited this as a medical view.

■■■ We must consider the trial as a whole to determine if the party has been deprived of his right to a fair trial by alleged improper argument to the jury. The trial court is in the best position to make this determination, and thus every reasonable presumption must be made that the trial court has properly exercised its discretion. (*Elizer v. Louisville & N. R. Co.* (1970), 128 Ill.App.2d 249, 254; *Johnson v. Cunningham* (1969), 104 Ill.App.2d 406, 412.) Examples we have given are the principal ones relied upon by the plaintiff insofar as they relate to the issue of damages rather than the liability issue. We have carefully examined the record as a whole, and agree with the trial court that the plaintiff was not denied a fair trial to determine the damages sustained because of the argument of counsel.

■■ Plaintiff further claims that she was deprived of a proper examination of Dr. Immermann on the question of whether there was aseptic necrosis. The Doctor testified that circulation of the hip was intact. He then commented that one of his biggest "worries" was "the blood supply going haywire and the whole head * * *", when he was stopped by an objection. The court did not deny an opportunity to question whether the Doctor could say with a reasonable degree of medical certainty that necrosis would be a permanent condition, and when counsel concluded with a question as to any other objective findings by the Doctor, his objective findings did not include any indication of aseptic necrosis or its onset. The case is thus distinguishable from *Boose v. Digate* (1969), 107 Ill.App.2d 418, 423, and *Dallas v. Granite City Steel Co.*, (1965), 64 Ill.App.2d 409, 424-426.

The judgment below is affirmed.

Judgment affirmed.

GUILD and DOUGLAS, JJ., concur.