H. VINCENT ALLEN & ASSOCIATES, INC., Plaintiff-Appellee, *v.* ROBERT M. WEIS *et al.*, Defendants-Appellants.

First District (1st Division)   No. 77-750

Opinion filed July 31, 1978.

Mitgang, Levine & Schwartz, of Chicago (John B. Schwartz, of counsel), for appellants.

Harold A. Liebenson, of Chicago (Harold A. Liebenson, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

H. Vincent Allen & Associates, Inc. (plaintiff), a commercial art studio in Chicago, filed a complaint against Robert M. Weis (defendant), a former salesman and vice president of the plaintiff, and Art Associates, Ltd., a commercial art company established by defendant after leaving the plaintiff's employ. Count I sought to recover $7000 allegedly overdrawn by defendant while employed by plaintiff. Count II sought damages from defendant and his company, Art Associates, Ltd., for losses allegedly incurred by defendant's breach of fiduciary duty and solicitation of valuable accounts and employees belonging to the plaintiff. A jury returned a verdict awarding plaintiff the $7000 overdraft and $30,000 for the claimed losses. Defendant appeals.

Defendant contends the trial court erred in refusing to submit one of defendant's tendered jury instructions; the plaintiff was permitted to file a late jury demand without proper showing of good cause; the verdicts were contrary to the manifest weight of the evidence; and the evidence was insufficient to substantiate the $30,000 awarded on count II. The plaintiff contends there was no trial error with respect to the tendered jury instruction or the granting of the late jury demand; the verdicts were not contrary to the manifest weight of the evidence; and the $30,000 award is supported by sufficient evidence.

Ted Link, a commercial artist and art director of a large manufacturing company, testified as a witness for plaintiff that he had used the services of plaintiff for many years. In the spring of 1968 he was approached by the defendant while dining at a restaurant. The defendant said he was leaving plaintiff and asked if there was any possibility Link could provide him with some or all of the advertising work of the manufacturing company with which Link was associated.

John Allen testified that he was the son of H. Vincent Allen, founder and president of the plaintiff. The witness was working as a salesman for plaintiff in the spring of 1968. After a conversation with Joseph Peota, one of the art directors for plaintiff, he consulted with his father in Arizona and the decision was made to terminate defendant's association with the

plaintiff. A letter prepared by the plaintiff's attorneys, dated May 31, 1968, was sent to defendant by registered mail informing him that his services were terminated as of May 31, 1968. The witness also testified that approximately one week later he encountered defendant in a tavern. He recalled the defendant saying, "I'm out of the studio [plaintiff], now; and * * * I will take the key personnel or the people I need and the business."

The defendant testified as an adverse witness. (Ill. Rev. Stat. 1977, ch. 110, par. 60.) He first came to work for plaintiff during 1955 as a salesman. On February 1, 1962, the parties entered into a written employment contract. Defendant was appointed executive vice president of the plaintiff company. It was his duty to "manage all operations and business affairs" of the plaintiff. Defendant's compensation was fixed at 25 percent of the annual gross profit of plaintiff. The contract defined the term "gross profit."

On October 21, 1963, the parties entered into an additional written contract. They modified the previous agreement of February 1, 1962, to provide that defendant's compensation was to be based upon the net profit of plaintiff. His compensation was to be 40 percent of plaintiff's net profit with additional compensation for any greater net profits, all as provided in the agreement. This agreement also provided for a weekly draw by defendant of $615 per week which was to be against his earnings as calculated on the net profit.

On December 11, 1967, the parties entered into a memorandum amendatory agreement which provided that any debit balance due from defendant to plaintiff corporation as of August 31, 1967, would not be considered in any future salary computation. The agreement provided for a base salary to defendant of $26,000 per year to apply against commissions with the stipulation that defendant was to receive whichever of these items was higher. It is undisputed that prior to the amendment of December 11, 1967, defendant was overdrawn to the extent of $7000 which constituted a debit against him.

The defendant also testified that in the last years of his association with the plaintiff he earned $26,000 per year. On the contrary, his wage and tax statement for 1967, his last year, revealed gross income of $31,980. The defendant further stated he began his own art business 2 or 3 months after leaving the plaintiff. However, the sales journals for defendant's company covering 1967 and 1968 received in evidence listed invoices billing several of the plaintiff's accounts for services apparently completed during the week of June 13, 1968. These journals also show that several of the customers of defendant were formerly accounts of the plaintiff. The defendant acknowledged that several employees of the plaintiff became associated with his company after they had left plaintiff.

H. Vincent Allen, founder and president of plaintiff, listed 13 artists and

salesmen who had been employed by plaintiff for many years and left between 1968 and 1970 to become associated with defendant's company. The witness also testified it was necessary for plaintiff company to terminate the services of some of these employees, but this had been caused only by lost profits and inability to maintain payroll. According to Mr. Allen the gross amount of plaintiff's business for 1963 was $550,541. This figure was substantially duplicated from 1964 through 1967. Between 1969 and 1971 the gross profits dropped from $405,000 to $146,000. He attributed this decline directly to the loss of personnel essential to the marketing of specialized art work for the commercial projects produced by the plaintiff. The witness also stated the $7000 paid to plaintiff represented an overdraft by defendant prior to the December 11, 1967, amendment to the agreement and that this debt was not cancelled pursuant to the amendment. Allen's figures concerning business losses were corroborated by plaintiff's accountant.

Several artists who were formerly associated with the plaintiff for many years, and are now either partners or employees of defendant's art company, testified in defendant's behalf. These witnesses stated they left plaintiff's employment or were terminated between 1968 and 1970 due to declining profits and only thereafter were they employed by defendant. The witnesses stated that H. Vincent Allen had a drinking problem. They denied discussing association with defendant prior to his termination by plaintiff and prior to their own departure from employment of plaintiff. Tak Hirai, a scratch board artist employed by plaintiff since 1949, stated he left plaintiff in June of 1968 to begin a free-lance business. Shortly thereafter defendant approached him in the hopes of obtaining his services. On cross-examination the witness acknowledged that defendant's company, of which he is a partner, began business June 13, 1968, and took jobs from several customers formerly serviced by plaintiff. Joseph Peota, the art director for plaintiff, denied he had ever discussed defendant's plans to leave the studio with John Allen.

On direct examination the defendant referred again to his gross earnings for 1967 and testified he earned approximately $31,000 for the calendar year ending December 1967. The witness explained he was terminated because of his "investigation into the lack of making net profits." The defendant recalled meeting John Allen in a tavern but testified he only stated at that time, "I can't understand getting this letter from your father." The defendant denied approaching any employees of plaintiff prior to his own termination or prior to their departure from the employment of plaintiff. The defendant stated he was overdrawn $7000 against his commissions.

■■ We will first consider defendant's contention that the verdicts are contrary to the manifest weight of the evidence. An imposing body of

legal authority has recognized that officers or directors of a corporation owe a fiduciary duty toward it and " "* * * are subject to the general rule in regard to trusts and trustees, that they cannot, in their dealings with the business or property of the trust, use their relation to it for their own personal gain. * * *' " (*Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 278, 166 N.E.2d 793, quoting from *Dixmoor Golf Club, Inc. v. Evans* (1927), 325 Ill. 612, 616, 156 N.E. 785.) Our supreme court has found an important consideration in the determination of breach of fiduciary duty to be whether the directors and officers were "actively exploiting" their positions within the corporation for their own personal benefit. (*Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 29, 317 N.E.2d 39, cited in *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 304-05, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398.) An inquiry into a claim of breach of a fiduciary relationship must also consider that activities of the directors or officers may "hinder or defeat" the ability of the corporation to continue or develop the business for which it was created. (*Patient Care Services, S.C. v. Segal* (1975), 32 Ill. App. 3d 1021, 1029-30, 337 N.E.2d 471, *appeal denied* (1976), 61 Ill. 2d 602; see also *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 289-292, 219 N.E.2d 541, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262.) The burden of proof is upon the fiduciaries to establish the fairness of those transactions in which they have acquired corporate assets. *Winger v. Chicago City Bank & Trust Co.* (1946), 394 Ill. 94, 110, 67 N.E.2d 265; *Gans v. Marlowe Pen Co.* (1969), 112 Ill. App. 2d 52, 60, 250 N.E.2d 811, *appeal denied* (1969), 42 Ill. 2d 583.

In our opinion, the testimony of Ted Link supports the plaintiff's claim that defendant was actively soliciting plaintiff's business prior to his departure from plaintiff's employment. John Allen's version of the tavern conversation between himself and defendant further tends to prove that defendant actively sought key personnel and valuable accounts of plaintiff. Defendant's testimony concerning the substance of the tavern conversation as well as his denial of employee solicitation and the other testimony he adduced, raise issues of credibility for resolution by the jury. It must be remembered, as above shown, that defendant was impeached on several points, notably the actual starting date of his new business and his first statement of gross income for 1967. The evidence also revealed a quick decline in plaintiff's profits following defendant's departure, a significant number of plaintiff's artists and staff personnel who became associated with defendant's company between June 1968 and 1970, and a fair number of plaintiff's accounts listed in defendant's sales journals, which recorded invoices beginning June 13, 1968.

■■ We recognize that the witnesses testifying on defendant's behalf maintained defendant did not approach them prior to their departure

from the plaintiff's employment. However, the majority of the 13 employees who changed studios left the plaintiff's employment directly for defendant's company between 1968 and 1970. It was Mr. Allen's testimony that the losses suffered by plaintiff's business in the years 1968 through 1971 were attributable to the departure of key artistic personnel. The fact that the witnesses stated they were approached by defendant only after leaving the plaintiff's employment is not a conclusive indicator of defendant's fairness. The constructive trust imposed upon officers and directors applies as well to transactions completed after the termination of the party's association with the corporation "if the transactions began during the existence of the relationship or were founded on information or knowledge acquired during the relationship." *Mile-O-Mo Fishing Club, Inc. v. Noble* (1965), 62 Ill. App. 2d 50, 57, 210 N.E.2d 12.

■■ It is the traditional function of the jury "to determine the preponderance of the evidence, and a reviewing court will reverse only if this determination is against the manifest weight of the evidence." (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 553, 356 N.E.2d 779.) In the case before us, as above shown, the burden of proof rested upon the defendant as a fiduciary to prove the fairness of his conduct toward plaintiff. However, the parties tendered instructions, given by the trial court without objection, to the effect that the burden of proof rested upon plaintiff. In our opinion, even considering that plaintiff had the burden of proof, the verdict of the jury is amply supported by the testimony as regards the liability of defendant to plaintiff on count II of plaintiff's complaint.

■■ Defendant also claims the damages of $30,000 awarded as to count II were not supported by any evidence and that the jury was improperly instructed as to assessment of the alleged losses. The testimony of H. Vincent Allen revealed a substantial drop in gross profits from plaintiff's business during 1969 through 1971 from some $450,000 to $146,000. Further, the exhibits entered into evidence reflecting the amounts billed defendant's accounts indicate not only that defendant began obtaining financial compensation June 13, 1968, but that several of the customers billed were formerly accounts of the plaintiff. For the period of June 13, 1968, through the end of 1968 defendant's sales journals reveal $45,000 in business charged by defendant to former customers of the plaintiff. In cases of damages suffered for alleged losses of business, "absolute certainty as to the amount of loss or damage in such cases is unattainable but that is not required to justify a recovery." (*Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289, 115 N.E. 389, quoted in *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 147, 281 N.E.2d 323.) In *Schatz*, the court also approved the statement from *Barnett* that the proper requirement is that "the evidence shall with a fair degree of

probability tend to establish a basis for the assessment of damages." (*Schatz,* 51 Ill. 2d 143, 148-49, quoting from *Barnett,* 277 Ill. 286, 289.) The courts of Illinois have held "that the loss of profits, whether past or future, claimed to arise out of exclusion from a market is customarily not susceptible of detailed or direct proof \* \* \*." (*Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 310, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398.) In *Werner's Furniture, Inc. v. Commercial Union Insurance Co.* (1976), 39 Ill. App. 3d 59, 70, 349 N.E.2d 616:

> "It has been held repeatedly that the ascertainment and assessment of damages is a question of fact which is peculiarly within the province of the jury and, where there is no issue raised concerning the instructions on damages and no showing that the size of the verdict was the result of passion or prejudice or a patent disregard of any element of damages, the determination by the jury will be affirmed. *Maguire v. Waukegan Park Dist.* (1972), 4 Ill. App. 3d 800, 804, 282 N.E.2d 6, *leave to appeal denied,* 52 Ill. 2d 594."

■■ We have before us no issue regarding passion or prejudice by the jury. There is no showing of any patent disregard of any element of damages. As regards the instruction on damages, we find the record to reflect a state of confusion. According to the record, and to the abstract filed by defendant, the trial court gave plaintiff's tendered instruction No. 5 based on Illinois Pattern Jury Instructions, Civil, No. 30.01 (2d ed. 1971) (hereinafter cited as IPI Civil), over objection. This instructed the jury, as to count II, to fix the amount of money which would reasonably and fairly compensate plaintiff for any of the elements of damage proved by the evidence to have resulted from the wrongful conduct of the defendant. The elements listed are the value of any loss to the plaintiff from the breach of fiduciary relationship, loss from breach of the contract between the parties, value of the loss of income to the plaintiff and value of the loss due to interruption of the plaintiff's business.

■■ The conference on instruction shows that an instruction which the parties refer to as plaintiff's instruction No. 5 was discussed. The trial court directed counsel for defendant to state his objections to the instruction. The record then shows: "(Discussion held off the record.)" Thus, we are totally uninformed as to the objections made by counsel for defendant to this instruction at the conference. (See Ill. Rev. Stat. 1977, ch. 110A, par. 239(b); *Delany v. Badame* (1971), 49 Ill. 2d 168, 178, 274 N.E.2d 353; *O'Neill v. Montalbano* (1972), 3 Ill. App. 3d 414, 417, 279 N.E.2d 467.) The record also shows that shortly thereafter the trial court stated that he would give instruction No. 5 unless another instruction was substituted. There is no showing in the record as to whether any other

instruction was substituted or tendered by defendant or whether the record now presents instruction No. 5 in its original or in an amended form. Under these circumstances we are unable to consider the objections to the instruction now raised by defendant in its brief.

■■ Defendant also urges that plaintiff failed to produce opinion evidence as to the exact amount of the damages. The absence of direct evidence as to any particular amount of damages does not by itself demonstrate any reason to attack the verdict of the jury. (*Werner's,* 39 Ill. App. 3d 59, 71, and authorities there cited.) Accordingly we find no error in connection with the assessment of damages on count II of plaintiff's complaint.

■■ We will next consider the verdict of the jury in favor of plaintiff on count I for the overdraft of $7000 allegedly due from defendant to plaintiff. Defendant first urges that the amendatory agreement of December 11, 1967, which changed the arrangement between the parties so as to provide for payment to defendant of a salary, as distinguished from a draw against commissions, forgave any overdraft which existed on that date. We disagree. We find nothing in the amendatory agreement which affects the financial arrangement between the parties prior to the date thereof and the preexisting debt due plaintiff from defendant. On the contrary, the amendatory agreement provides that any debit balance then previously due from defendant to plaintiff "will not be considered in any future salary computation." In addition, H. Vincent Allen testified that defendant's overdraft was not cancelled by this amendatory agreement. We conclude that the amendatory agreement of December 11, 1967, was not intended to affect the then existing overdraft arising from defendant's drawing account.

■■ Defendant also makes a factual contention in this regard. He admits the existence of the $7000 overdraft but takes the position that this sum equals the amount of salary he would have received if the defendant had complied with the 90-day termination clause in the contract of employment. It is correct that the contract between these parties, dated February 1, 1962, as modified on October 21, 1963, and as amended on December 11, 1967, provided:

> "* * * this agreement may be terminated by either party upon 90 day written notice to the other party."

The contract of employment contained no specific term or termination date other than the above 90-day clause. In our opinion the legal relationship between these parties was an employment at will with the contract being subject to termination by either party upon giving of 90-day notice. (See *Roemer v. Zurich Insurance Co.* (1975), 25 Ill. App. 3d 606, 610, 323 N.E.2d 582.) However, this fact does not and cannot eliminate the basic principle of the law regarding employment contracts

which gives the employer the right of discharge for good cause even though such right is not stated in the agreement and even though the agreement may delineate certain specific causes for discharge. *Corman Aircraft Corp. v. Weihmiller* (7th Cir. 1935), 78 F.2d 241, 243.

We find this principle strongly illustrated in *Hosking v. Hollaender Mfg. Co.* (1961), 114 Ohio App. 70, 175 N.E.2d 201. There, plaintiff sued for salary resulting from an employment contract which provided for payment to the employee of a 60-day termination pay after discharge. The plaintiff employee was discharged for cause. A jury returned a verdict in his favor in his suit for the 60-day termination pay. The Court of Appeals of Ohio reversed this finding on the ground that where an employee has been rightfully discharged for cause, he forfeits any termination pay which may have been due to him under the contract of employment. The court in *Hosking* cited another Ohio case to the effect that to justify discharge for cause before expiration of a term of employment, " 'it is sufficient for the employer to show that the employee was guilty of a default in duty whose natural tendency was to injure his business, and actual injury thereto need not be shown.' " *Hosking*, 114 Ohio App. 70, 72, concerning *Beckman v. Garrett* (1902), 66 Ohio St. 136, 64 N.E. 62.

■■ In the case before us, the jury awarded damages to plaintiff for defendant's breach of his fiduciary duty as plaintiff's employee. In our opinion, this verdict amounts to an adjudication that defendant was discharged by plaintiff for good cause. It follows that the discharge letter sent to defendant on May 31, 1968, operated as an effective termination of the contract between these parties for good cause and defendant was not entitled to recover additional salary representing the 90-day termination period expressed in the employment contract.

■■ Defendant also contends that the trial court erred in refusing to give the jury the following instruction:

"If you find that plaintiff's employees left its employ because of plaintiff's harassment, or mismanagement, or poor administration, or state of intoxication, you must find for the defendants.

If you find that there was no premeditated plan between defendants and/or anyone else to induce plaintiff's employees to leave its employ, or to take over plaintiff's accounts, you must find for the defendants."

The difficulty with this instruction is that it is peremptory in nature, directing the jury to find for the defendant. A peremptory instruction must "contain all the facts and be complete within itself * * *." (*Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 516, 119 N.E.2d 241, quoted in *Dziewatkowski v. City of Chicago* (1969), 109 Ill. App. 2d 405, 414, 248 N.E.2d 734.) In the case before us the possibility remains the employees

left the plaintiff's employment for several reasons including but not solely due to Mr. Allen's alleged drinking problem. It is also questionable whether this was a proper issue instruction as the defendant has thereby limited liability to one area and omitted reference to fiduciary responsibilities and interference with the studio business. IPI Civil No. 20.00.

Further, an examination of defendant's closing argument reveals repeated references to the position articulated in this refused instruction. We cannot conclude that defendant was prejudiced by failure to give this instruction.

■■ Defendant finally contends that the trial court erred by granting the plaintiff leave to file a late jury demand. The record reveals trial commenced November 22, 1976, and includes a jury demand filed by plaintiff on November 23, 1976. The granting or denial of a late jury demand is subject to the sound discretion of the trial court. (Ill. Rev. Stat. 1977, ch. 110, par. 59; *Hudson v. Leverenz* (1956), 10 Ill. 2d 87, 92, 139 N.E.2d 255; *Johnson v. Sabben* (1972), 7 Ill. App. 3d 238, 241, 282 N.E.2d 476.) Because of the substantial right to a jury trial, a late jury demand may be granted upon a showing of good cause. (*Trapani v. Trapani* (1969), 109 Ill. App. 2d 202, 206, 248 N.E.2d 294.) We are unable to conclude the plaintiff failed to demonstrate good cause. The record contains merely the filed jury demand. Defendant's post-trial motion shows only that the trial court used its discretion "in granting a jury trial." It is the duty of the appellant to furnish a complete record. (*Belcher v. Spillman* (1975), 28 Ill. App. 3d 973, 975, 329 N.E.2d 550; *Maborn v. Moyers* (1975), 26 Ill. App. 3d 231, 233, 325 N.E.2d 47.) The record before us contains no objection by defendant at trial to proceeding with the jury. We are therefore unable to consider the merits of this contention.

We find no reversible error here and the judgment appealed from is affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.