917 F.2d 565
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
VOLTZ CORPORATION and Charles Hotze, Plaintiffs-Appellants,
v.
CUSTOM PUBLISHING SERVICES and Lucy Brown, Defendants-Appellees.
 No. 88-3265.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 15, 1990.
Decided Oct. 31, 1990.
 
 Before WOOD, JR., COFFEY and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 This appeal is little more than a claim in the face of conflicting testimony that the district court weighed the evidence incorrectly. The findings of the trial court are not clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). We affirm.
 
 
 2
 Lucy Brown[1] went to work for plaintiff Voltz Corporation, formerly known as Medical Digest Incorporated (MDI), in 1960. MDI was a publisher of monthly digests of abstracts of articles published by other medical journals. Ms. Brown was initially hired as a copy editor and thereafter was elevated to an executive officer's position as well as to the position of being a director of MDI. In 1967 Ms. Brown resigned when Charles Hotze, the owner of MDI, declined to support her in a dispute with another MDI officer.
 
 
 3
 Around 1970 Mr. Hotze established another publishing corporation, Medical Communications Incorporated (MCI) which focused on single sponsor publications. These publications featured articles designed to promote a product sold by the sponsor.
 
 
 4
 In 1973 Mr. Hotze persuaded Ms. Brown to "come back and run the office for him." She became a director and the president of MDI that same year, and later of MCI as well. (Ms. Brown and Mr. Hotze were the only employees of MCI.) Thereafter she managed both businesses until 1979.
 
 
 5
 Tensions developed between Mr. Hotze and Ms. Brown in 1978 because Mr. Hotze allegedly was interfering with her management of the business enterprise. Mr. Hotze bypassed Ms. Brown and gave direct orders to those employees under her supervision and also overrode an order of hers prohibiting the transfer of funds from the profitable MCI, in which he had given her one-half of the stock, to MDI. Hoping to prevent Ms. Brown from resigning at that time, Mr. Hotze instructed his attorney to draft a non-interference agreement binding on both parties and each signed it. The agreement provided that should Mr. Hotze undermine, countermand or interfere with any of Ms. Brown's powers or authority, Mr. Hotze would be in breach of the contract. In that event, Ms. Brown had the right to resign and thereupon receive one year's salary from Mr. Hotze personally, payable in monthly installments. Nonetheless, the record reflects that Mr. Hotze continued to countermand Ms. Brown's decisions and in December 1978, therefore, Ms. Brown gave Mr. Hotze a letter of resignation, effective June 1, 1979, which he destroyed. On April 5, 1979, she submitted another letter of resignation, which he also destroyed. Mr. Hotze then instructed the receptionist to direct all of Ms. Brown's mail and telephone calls to him. On April 10, 1979, Ms. Brown sent a third resignation letter to Mr. Hotze by registered mail, which advanced the effective date of resignation to May 1, 1979. The reason for the earlier date was that after Mr. Hotze diverted her mail and telephone calls, she "felt it was useless to stay on any longer." The trial judge found that Ms. Brown was neither an officer, shareholder, nor employee of either MCI or MDI after her resignation April 30, 1979.
 
 
 6
 Shortly before Ms. Brown left MCI and MDI, Mr. Hotze and two of his attorneys visited with her in an attempt to convince her that she had no right to compete with MCI or MDI after leaving the firm. She, however, insisted that she had a right to engage in any publishing activity she chose and in her final letter of resignation letter, she wrote the following:
 
 
 7
 "In the past I have endeavored to the best of my ability to further the interests of these companies and I will continue to do so until my resignation is effective. I want you to understand, however, that as of May 1, 1979, I will consider myself free to carry on whatever business interests I then deem appropriate."
 
 
 8
 Thus, it is clear that Ms. Brown never intended to refrain from competing with MCI or MDI.
 
 
 9
 The day her resignation from MCI and MDI became effective, Ms. Brown incorporated her own medical publishing corporation, Custom Publishing Services (CPS). Shortly thereafter CPS began doing some work for MCI and MDI as an independent contractor, but it was on the express condition that Ms. Brown would be free to spend a good deal of her time pursuing her other medical publishing interests. CPS continued the relationship with MCI and MDI throughout 1979, but always as an independent contractor. In January of 1980, Ms. Brown moved CPS to New Jersey, and the relationship with MDI ended at that time.
 
 
 10
 MDI's financial condition deteriorated rapidly during 1979. Advertising revenues declined, and even though Mr. Hotze consolidated the November and December issues, the corporation was on the verge of bankruptcy at the end of the year. The consolidated issue was the last digest MDI produced.
 
 
 11
 Several of MDI's international customers transferred their business to CPS when it became clear that MDI could no longer provide abstracts of medical articles for them. Mr. Hotze was present at the meeting where one of his foremost European customers stated he was transferring his business to CPS--Mr. Hotze confirmed that MDI would publish no more material and offered no objection to the new arrangement.
 
 
 12
 With the demise of MDI, Mr. Hotze needed outside help to produce the MCI single-sponsor publications that he had previously agreed to publish for 1980. He negotiated a contract with CPS in which CPS agreed to produce the existing single-sponsor publications, but Ms. Brown made it clear that CPS would neither solicit business for MCI nor produce new publications--CPS was busy soliciting its own new business. CPS continued producing the single-sponsor publications until late in 1983 when Mr. Hotze initiated this lawsuit.
 
 
 13
 In mid-1982 Mr. Hotze attempted to persuade Ms. Brown to renew their prior business relationship. After repeated rejections, he sent her a letter proposing that they combine their efforts "in order to avoid costly and destructive confrontation."[2] Upon Ms. Brown's continued refusal to return to work for him, Mr. Hotze initiated what eventually became a five-count complaint. Count I alleges Breach of Fiduciary Duty; Misappropriation of Corporate Opportunities and Other Assets; Count II alleges Intentional Interference with Contract and Business Relationships; Count III alleges Unjust Enrichment; Count IV alleges Breach of Partnership Agreement; and Count V alleges Breach of Contract. The defendant filed a counterclaim for breach of Mr. Hotze's non-interference agreement, and the parties went to trial before the court without a jury.
 
 
 14
 At the close of the plaintiffs' case, the defendant moved to dismiss Counts I, II, III and IV of the complaint pursuant to Federal Rule of Civil Procedure 41(b).[3] The district court dismissed Count I, II, III and IV, entered judgment by consent against CPS on Count V, and entered judgment for Ms. Brown on her counterclaim. The plaintiffs appeal the dismissal of Count I only, Breach of Fiduciary Duty; Misappropriation of Corporate Opportunities and Other Assets.
 
 DISCUSSION
 
 15
 The trial judge found that Ms. Brown had no fiduciary duty to Mr. Hotze or his corporations, thus she did not misappropriate a corporate opportunity or asset. On the issue of whether Ms. Brown had a duty not to compete, the court found it "incredible" to believe that under the circumstances she would have made such an agreement. In the words of the trial judge, "[t]he fundamental problem with plaintiffs' case is that in this litigation plaintiff has been attempting to enforce a non-compet[ition] agreement that does [no]t exist."
 
 
 16
 The plaintiffs would have us hold that even in the absence of a specific non-competition agreement, once an employee becomes a corporate officer, she may not leave the corporation and establish a similar corporation if the new corporation might eventually compete with her prior employer. From our perspective, such a holding, in addition to being absurd, would be an undue burden on commerce. America's economic health is dependent on a constant flow of entrepreneurs forming their own businesses to produce a better or more economical product. That is exactly what Ms. Brown did.
 
 
 17
 Moreover, the plaintiffs want this court to ignore the fact that MDI was practically defunct when Ms. Brown supposedly usurped the corporate opportunities. H. Vincent Allen & Assoc., Inc. v. Weis, 63 Ill.App.3d 285 (1st Dist.1978), 379 N.E.2d 765, to which the plaintiffs analogize, is inapposite to the facts of this case. In Weis, H. Vincent Allen & Assoc., Inc. was a profitable corporation that produced commercial art when a corporate officer was dismissed. There was evidence of an alleged threat to get revenge, and the officer did indeed create a competing corporation that drew away crucial employees as well as significant customers. As a result of the loss of crucial employees, the corporation was no longer able to create all of its prior artistic products, thus it lost more customers. In a two-year period, the gross income dropped about 60 percent. The corporate president alleged, and the court found, that the drop was caused by the defendant's breach of his fiduciary duty. In contrast, the plaintiffs do not allege that Ms. Brown caused MDI's demise as did the defendant in Weis.[4] Their complaint is that Ms. Brown appropriated corporate opportunities for herself. MDI, however, was unable to exploit the available opportunities because it was on the verge of bankruptcy. Thus, there was no opportunity to misappropriate.
 
 
 18
 The plaintiffs rely heavily upon corporate minutes signed by Ms. Brown after April 30, 1979. One, dated January 15, 1980, purported to record her election as a director of MCI; the other, dated August 18, 1980, purported to confirm her resignation from MCI on that date. Indeed, in their reply brief the plaintiffs argue for the first time that the signature on the corporate minute estops Ms. Brown from challenging the corporate minutes' validity with parol evidence. They, however, ignore the conflicting corporate records confirming Ms. Brown's resignation on April 30, 1979. Mr. Hotze signed an MCI minute April 30, 1979 acknowledging Ms. Brown's resignation as of that date, and another corporate minute, dated January 15, 1980, recording the election of Mr. Hotze and his wife as the only corporate officers. No evidence was offered challenging the validity of these minutes. Furthermore, the corporate records contain a stock certificate for half of the MCI stock reflecting that Mr. Hotze had given it to Ms. Brown, returnable upon her resignation. The certificate, signed by both Mr. Hotze and Ms. Brown, reflects the date of return as April 30, 1979. The stock receipt in the MCI minute book also bears the date of April 30, 1979, but it is scratched out, and August 18, 1980 is written above it. Ms. Brown testified that the latter date was not there when she signed it; Mr. Hotze testified that Ms. Brown attempted to backdate the receipt, but he made her change the date. He failed to explain, however, why the stock certificate still contains the April 30, 1979 date. The trial judge concluded that the earlier date was the correct one.
 
 
 19
 Thus at most, the two corporate minutes signed by Ms. Brown introduce a certain amount of ambiguity into the record, and parol evidence may be used to shed light on ambiguity.[5] Sunstream Jet Express v. International Air Service Co., 734 F.2d 1258, 1266 (1984) ("Illinois decisional law provides that even when a contract is integrated on its face, if the contract is ambiguous, as a matter of law, then extrinsic and parol evidence is admissible 'to explain the terms of the ambiguous contract.' " (citations omitted)). Ms. Brown testified that she signed the January 15, 1980 and August 18, 1980, minutes as an accommodation to Mr. Hotze because his creditors were apparently trying to "pierce the corporate veil" of MCI and MDI under an "alter ego" theory. The trial judge found Ms. Brown's explanation of the conflicting corporate records to be the only plausible one, and his finding was not clearly erroneous.
 
 
 20
 The contested facts in the case were properly decided in Ms. Brown's favor. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). Since it is the function of the trial court to "weigh and determine the credibility of the witnesses and resolve any inconsistencies in their testimony," we will not reweigh the evidence. Quadrini v. Clusen, 864 F.2d 577, 583 (7th Cir.1989). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). Because the trial judge's findings are not clearly erroneous (or even colorably so), his dismissal of the plaintiff's claim for breach of fiduciary duty and misappropriation of corporate opportunities is
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 Co-defendant Lucy Brown's name is now Lucy Brown Gregory, but it was Lucy Brown at the time the relevant events occurred
 
 
 [2]
 Mr. Hotze was billed for that letter by his attorney as part of a strategy designed to "take over" Ms. Brown's business
 
 
 [3]
 Federal Rule of Civil Procedure 41(b) reads in pertinent part:
 "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."
 
 
 [4]
 Ms. Brown's departure may, in fact, have been responsible for MDI's demise because she was apparently the only one competent to manage the business. Her competence, we believe, does not entitle Mr. Hotze to indenture her
 
 
 [5]
 While contracts and corporate minutes serve different purposes, the parol evidence rule accomplishes the same goal for both--it prohibits admitting extrinsic evidence to create ambiguity where none exists but allows parol evidence to clarify existing ambiguity