In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1466

JABAT, INC.,

Plaintiff/Counterclaim Defendant-Appellant,

v.

GARY SMITH and THE LINKS CO.,

Defendants/Counterclaimants/Third-Party
Plaintiffs-Appellees,

v.

K. JABAT, INC.,

Third-Party Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois, Benton Division.
No. 97-CV-4192-JPG--J. Phil Gilbert, Chief Judge.

Argued September 28, 1999--Decided January 7, 2000

Before Bauer, Flaum and Diane P. Wood, Circuit
Judges.

Bauer, Circuit Judge.  This is a breach of
contract action arising from the breakdown of a
business relationship between Gary Smith
("Smith") and the Links Co. ("Links"), the
defendants/counter-plaintiffs/appellees in this
matter, and Jabat, Inc. and K. Jabat, Inc.
(collectively "Jabat"), the plaintiffs/counter-
defendants/appellants. The jury found for Smith
and Links and against Jabat. The district court
ordered a remittitur and denied Jabat's motion
for a new trial. Claiming error in the exclusion
of certain evidence at trial and that the
remittitur exceeds the highest possible award
supported by the evidence, Jabat appeals. We
affirm.

I.  BACKGROUND

In 1993, Smith approached Jabat with a proposed
business deal. Jabat manufactures plastic parts
that are used in other products. Smith's
background is in production and sales, primarily

in the grass bag industry. He conducts business through a sole proprietorship called "The Links Company."

Through his work in the industry, Smith learned that American Yard Products ("AYP") was paying too much for the plastic parts used in its grass bag production./1 He realized that if he could find a manufacturer to sell him the parts at a lower price he could turn around and sell them to AYP for a mark-up, thereby making a profit for himself. AYP produces over 1.5 million bags annually for Sears, and, therefore, the business from AYP could be substantial.

Smith obtained quotes from several plastic extruder manufacturers, including Jabat, for the plastic parts used to hold grass bags on lawn mowers. Jabat's price for the plastic clips was 88/100 cents per inch, with an additional one cent per part if notched off line. Based upon this price, Smith began negotiating with Jabat. He offered to bring AYP's business to Jabat if Jabat used him as a broker.

Because Smith could not afford to buy the parts from Jabat and resell them to AYP, it was agreed that Smith would act more as a sales representative. He would negotiate the price that AYP would pay to Jabat and service the account. In return, Jabat would pay Smith the "spread" (the difference between the price Jabat quoted to Smith and the price Smith negotiated with AYP). The deal was executed on September 3, 1993. It was subject to cancellation on ninety days written notice if either party violated the principle of good faith.

Jabat agreed to protect Smith's and Links' exclusive rights to market Jabat products to AYP as long as Smith was able to get an order from AYP within one year of the signing of the contract and as long as sales were maintained at a minimum of $50,000 per year. Although Jabat says it was its intent, there was no condition in the contract that Smith deal exclusively for Jabat.

The AYP business exceeded everyone's wildest expectations. Smith produced an order within one month, rather than within one year as required by the contract. Sales for the first six months totaled $205,000. Over time, Jabat and Smith were able to increase their business with AYP until they were the majority supplier of plastic bag clips to AYP.

But, the relationship between Jabat and Smith rapidly soured. Jabat began complaining that Smith was not communicating with it regarding the

pricing on the AYP account. In time they also began to suspect that Smith was not dealing exclusively on behalf of Jabat. Notwithstanding these concerns, Jabat continued working with Smith. The account was simply too profitable to jeopardize.

In January, 1995, Smith sought quotes from Jabat on 12 new parts he intended to market to AYP. Jabat confirmed that it would produce the new parts but told Smith it wished to change the manner of his compensation, from the "spread" to a ten percent commission. Smith rejected this proposal. The parties, by letter dated February 7, 1995, finally agreed that Smith would continue to receive the "spread" on the original parts but a ten percent commission on the 12 new parts.

The events which precipitated the breaking point in the relationship began in the Spring of 1995. Two of the 12 new parts Smith had marketed to AYP were to be used on a new lift top dustless bag AYP was making for Craftsman. AYP had tried for years to develop the bag, without success. The plastic parts needed to be bent to be sewn on the curved grass bag. Initially, Lockscreen (a competitor) and Jabat were both supplying blank straight parts. AYP would then punch a v-notch in the part, so the part could be bent. The sewers would bend the part and sew it on the bag. This process was time-consuming and slowed down processing.

Smith worked with AYP's grass bag manager to find a more expedient, cost effective process. At first, AYP tried a routed part from Jabat. The routed notch is more of a round notch than the v-notch and eliminated a step in the process because AYP was not required to punch the v-notch in the part. But, ultimately, AYP found the Jabat part was not acceptable because the routing prevented the part from completely closing.

Smith promised to devise a way to close down the notches for AYP, so that AYP would not have to do it. Using a welder, he was able to take Jabat's routed parts and Lockscreen's notched parts and sonicly weld the parts. With this configuration, all that AYP had to do was lay the bent part on the fabric and sew it to the fabric.

Unbeknownst to Jabat, Smith was reworking these parts in The Links' office in Georgia. He even started having Jabat and Lockscreen ship the parts directly to The Links' office. When two Jabat representatives stopped by The Links' office in February, 1996 to see Smith, they were surprised to see the electronic welder (which they interpreted as being a machine capable of manufacturing the parts they were supplying to

AYP) and their competitor's products in the office. Disturbed by these signs of "competitive activity," the Jabat representatives purchased a camera and returned to The Links' office to take pictures through the office window.

Smith denied competing with Jabat and the relationship floundered along for a little while longer. But, highly suspicious of Smith now, Jabat sought to change Smith's compensation arrangement again so that he received only a commission on all parts sold. The parties disagree on whether this arrangement, outlined in a letter dated June 4, 1996, ever became an agreement. The letter was silent as to whether cause was needed to terminate the parties' relationship.

On August 26, 1996, Jabat received a call from AYP's grass bag production line manager, upset about an order. The AYP manager complained that she had been trying for several days to contact Smith about the order but had been unable to reach him. Characterizing this as Smith's failure to service the account and placing Jabat's account with AYP at risk, Jabat terminated its contract with Smith.

Jabat sued Smith, alleging that he had breached the parties' contract by acting in bad faith. Jabat sought an injunction to prevent Smith from using Jabat's pricing information and money damages for the profits that Smith allegedly diverted from Jabat by selling his own product directly to AYP. Smith counterclaimed against Jabat, claiming that it breached the contract when it terminated him. Smith sought money damages for the compensation he would have earned from Jabat's sales to AYP.

The trial was contentious, with each side bitterly complaining about the other's conduct. Jabat sought to introduce evidence that Smith failed to file his income tax returns for 1996 and 1997. Furthermore, using Smith's deposition testimony that the copies of those returns he had produced during discovery were copies of the returns he sent to the IRS, Jabat sought to challenge Smith's credibility because those returns had not, at the time the deposition was taken, been sent to the IRS. The District Court refused to admit that testimony, ruling it would be collateral and too prejudicial. The court did, however, find that the returns themselves and the information in them was admissible to show Smith's income and damages.

Smith presented no expert testimony as to his lost income, instead relying solely on an exhibit calculating Jabat's sales to AYP through April, 1998. Despite this paucity of evidence, the jury

returned a verdict in favor of Smith and against Jabat in the amount of $804,302.04. Jabat moved for a new trial, claiming that the jury's verdict was excessive and not supported by the evidence. The District Judge agreed and said that unless Smith and Links accepted a remittitur that reduced the judgment to $590,000 he would order a new trial on the issue of damages. Upon Smith's and Links' acceptance of the remittitur, the District Court entered judgment in that amount.

## II. DISCUSSION

### A. Smith's Failure To File 1996 and 1997 Tax Returns

Jabat first raises as error the District Court's exclusion of facts demonstrating "Smith's willingness to conceal and avoid the truth: his failure to file income tax returns and his false testimony that he had done so." The District Court heard arguments on this issue in limine before trial, ruling that the timeliness of the tax returns' filing was a collateral issue which would confuse the issues before the jury and be unduly prejudicial. We review the District Court's evidentiary decisions for an abuse of discretion, United States v. Johnson, 127 F.3d 625, 630 (7th Cir. 1997) (citation omitted), keeping in mind that judges have wide latitude when deciding whether to admit or exclude evidence. Rarely will we disturb those decisions. United States v. Saunders, 166 F.3d 907, 920 (7th Cir. 1999).

In this instance we cannot say that the trial court abused its discretion. The ruling was carefully crafted to permit the introduction of the tax returns themselves and allow cross-examination of Smith as to the information contained therein. This was important so that the issue of Smith's mitigation of damages could be addressed as could Jabat's contention that Smith received income from its competitor. The issue of whether Smith was late in filing the returns had no bearing on these issues.

Jabat urges us to rule that the jury must be allowed to consider evidence of a party's failure to file tax returns to assess that party's credibility. Jabat cites no cases from this circuit to support its argument. Indeed, it offers as authority only one case from this jurisdiction in which evidence of prior convictions for failure to file tax returns was admissible for impeachment. United States v. Wilson, 985 F.2d 348, 350 (7th Cir. 1993). But that case is so factually dissimilar as to be unpersuasive. There, the defendant was being tried for conspiring to deceive the IRS, thus

making his failure to file tax returns relevant. That is not the case here. The issue before the jury was whether Smith breached the contract with Jabat.

In sum, we hold that the District Court did not abuse its discretion in barring Jabat from making reference to Smith's untimely filing of his 1996 and 1997 tax returns. Jabat's motion for a new trial on that ground was properly denied.


B.  Smith's Entitlement to Future Lost Income

Jabat next raises the issue of whether Smith is entitled to damages beyond the trial date. Jabat contends that Smith is not entitled to future lost income because he presented no evidence of how much the income might be. Indeed, Jabat claims that the issue should never have gone to the jury. However, Jabat made no objection to Smith Instruction No. 8 which states:
The elements of damages claimed by Smith in this case are the amount of money he would receive from Jabat from Jabat's past sales to American Yard Products and for Jabat's future sales to American Yard Products if Jabat had not wrongfully terminated the contract.
By failing to object to this instruction when it was tendered, we find that Jabat has waived its objection to the award of future lost income.

A party waives an argument on appeal if that argument relates to a jury instruction it failed to object to. Heritage Commons Partners v. Village of Summit, 935 F.2d 1489, 1492 (7th Cir. 1991). See also Wilson v. Kelkhoff, 86 F.3d 1438, 1442-43 (7th Cir. 1996). Here, the argument advanced by Jabat (that Smith could not recover future damages because they were too remote and speculative), is an indirect challenge to Instruction No. 8. Such an argument, once waived, cannot be brought on appeal. Bogan v. Stroud, 958 F.2d 180, 181-84 (7th Cir. 1992) reh'g den.; Sims v. Mulcahy, 902 F.2d 524, 533-36 (7th Cir. 1990), cert. denied, 498 U.S. 897 (1990).

"When parties do not object to jury instructions, these instructions generally become the law of the case." Geldermann, Inc. v. Financial Management Consultants, Inc., 27 F.3d 307, 312 (7th Cir. 1994). See also Rakovich v. Wade, 850 F.2d 1180, 1192 (7th Cir. 1987) (en banc), cert. denied, 488 U.S. 968 (1988). Once the law of the case is settled, the parties can only argue that the jury did not properly apply the instructions to the facts. Will v. Comprehensive Accounting Corp., 776 F.2d 665, 675 (7th Cir. 1985), cert. denied, 475 U.S. 1129 (1986). By permitting an instruction to be given

which clearly authorized the jury to award damages beyond the trial date, Jabat waived its right to claim that such damages could not be awarded.

### C. Evidence Supporting the Damages Award

Jabat's final challenge is to the amount of the damages awarded. Jabat claims that it is excessive and not supported by the evidence. Jabat seeks either a new trial on the issue of damages or a further remittitur in the amount of $402,728.70. We find that although this argument might indirectly relate to Instruction No. 8 it is more properly characterized as a challenge to the jury's application of the instructions to the facts, an argument not waived by Jabat's failure to object to Instruction No. 8. We review the District Court's remittitur under an abuse of discretion standard. DeBasio v. Illinois Central Railroad, 52 F.3d 678, 687 (7th Cir. 1995), cert. denied, 516 U.S. 1157 (1996) (citation omitted).

The substantive law of the state determines whether the damage award was adequately supported by the evidence. Gasperini v. Center for Humanities, Inc., 518 U.S. 515, 538 (1996). In Illinois, "the evidence need only to tend to show a basis for the computation of damages with a fair degree of probability." Medcom Holding Company v. Baxter Travenol Laboratories, Inc., 106 F.3d 1388, 1398 (7th Cir. 1997) (quoting In Re: Busse, 464 N.E.2d 651, 655 (1st Dist. 1984)). Moreover, lost profits need not be proven with absolute certainty. Medcom, 106 F.3d at 1399. Such damages are not capable of proof with absolute certainty and thus we merely require the evidence to "tend to establish a basis for the assessment of damages." H. Vincent Allen & Associates v. Weis, 379 N.E.2d 765, 770 (1st Dist. 1978).

Like the District Court, we wish that more evidence of Smith's future lost income had been presented. But we cannot say that the evidence that was submitted does not support the jury's verdict. Smith Exhibit 33a shows AYP sales to Jabat through April, 1998, and, correspondingly, the monies that Smith and Links would have earned during that time had the contract not been terminated by Jabat. Gleaning from these and past sales figures we know that Jabat's business with AYP was growing at a steady rate of ten percent per year. Thus, extrapolating from this, the jury did have a basis upon which to assess damages.

The District Court was able to make this type of extrapolation in determining the amount of the remittitur. By seeking a further remittitur in

the specific amount of $402,728.70 Jabat has also demonstrated that the measure of damages are readily calculable. Thus we reject the argument that the award of future damages cannot stand because they are speculative or that they are not supported by the evidence.

In setting the amount of its remittitur, the District Court used the "maximum recovery rule," which directs that the court set an amount based on the "highest amount of damages that the jury could properly have awarded based on the relevant evidence." Unisplay v. American Electronic Sign Co. Inc., 69 F.3d 512, 519 (Fed Cir. 1995). Jabat argues that the court made a "mathematical error" by adding the projected 1998 amount ($190,447.85) into the calculation twice, and thus contends the remitted amount is excessive. We do not address this issue as it was not presented to the trial court and was raised for the first time on appeal. We state merely that we believe that the judgment entered after the remittitur is within the range of the maximum recovery a jury could have awarded Smith. The award accurately reflects the proven commission amounts from August, 1996 through May, 1998, the length of time Smith had already worked for Jabat, and the evidence that the commissions Jabat paid on that account increased annually at a rate of about ten percent. This was the evidence at trial and the District Court properly relied upon it in setting the remittitur. There was no abuse of discretion.

III.  CONCLUSION

There was no error in the exclusion of the evidence regarding the untimely filing of Smith's tax returns. Our review of the evidence also convinces us that the District Court's remittitur was appropriate. Finding no abuse of discretion on either issue we hereby AFFIRM the judgment in favor of Gary Smith and The Links Co. and against Jabat, Inc. and K. Jabat, Inc.

AFFIRMED.


/1 AYP makes grass bags and mowers for Sears.