MYRTLE ERVIN, Plaintiff-Appellant, *v.* JOHN T. NEIL, Defendant-Appellee.
Second District   No. 79-130

Opinion filed January 30, 1980.

---

6

Robert E. Canfield, of Graves, Greenwald, Maier & Miner, of Rockford, for appellant.

Don M. Mateer, of Mateer & Erickson, of Rockford, for appellee.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

This is an appeal from the verdict of the jury awarding the plaintiff the sum of $5,000 as damages in a personal injury suit arising out of an automobile accident. The defendant filed a cross-appeal asking that the jury's verdict be conformed to hold him not liable, consistent with the jury's special finding that the accident was caused by "circumstances beyond his control * * *."

The plaintiff was a woman about 52 to 53 years old, employed by Admiral Corporation as an inspector at the time of the accident April 24, 1972. She was the passenger in the back seat of a car being driven by a Mrs. Hervey, from the Admiral plant to her home, after work. On Route 173, near Poplar Grove, while the Hervey car was traveling westbound, another car, driven by Donald Listerud, attempted to pass Hervey's car in or near a no passing zone. Route 173 is a two-lane road at this point and there was evidence that the shoulder of the highway was in bad condition. The defendant, John T. Neil, was driving a pickup truck eastward at the moment, approaching the Hervey car. There was a hill at this point and a bridge at the bottom of the hill. Seeing that he could not avoid a collision with the Listerud car, if he continued in the eastbound lane, Neil swerved his truck onto the right shoulder of the road, which caused him to lose control of his vehicle and come across the highway, colliding head-on with the Hervey vehicle and injuring the plaintiff.

The plaintiff was taken to a hospital in Belvidere where she stayed for several days and was diagnosed as suffering from a "massive hematoma of left lower leg, soft tissue trauma to the left shoulder, and contusions and abrasions of the back." Following her release from Highland Hospital in Belvidere, the plaintiff went to Rockford Memorial Hospital in Rockford where a lumbosacral corset was prescribed. Eventually, she was referred to Dr. Leonard, an orthopedic surgeon, at Canfield Clinic. He X-rayed her back and after several tests referred her to a firm of neurosurgeons, Vanderspek and Yake. Following their examination, the plaintiff went to Monroe Clinic, Monroe, Wisconsin, where she was seen by Dr. Herzberger and Dr. Berry. Dr. Herzberger performed a laminectomy. In answer to a hypothetical question based on an absence of symptoms of back problems prior to the accident, it was his opinion that plaintiff's back pains following the accident of April 24, 1972, were due to that accident. Following the laminectomy, the plaintiff was still suffering back pains and she consulted with Dr. Berry in Freeport in September 1976. He performed a fusion of two discs in her spine. She continued under Dr. Berry's care until January 1977.

Although the complaint was filed in April 1974, the case did not come to trial until September 18, 1978. During discovery, a month or so prior to trial, defense counsel apparently discovered there was a discrepancy

between a report issued by the Canfield Clinic under Dr. Leonard's name and Dr. Leonard's actual notes as to his diagnosis of the plaintiff's case. During a deposition of Dr. Berry a week or so before trial, it was established that Dr. Leonard had not actually made the diagnosis indicated in the Canfield Clinic report and apparently some words had been added to the report by someone other than Dr. Leonard as indicating that the plaintiff's back problems were due in part to "trauma"—meaning apparently the accident of April 24, 1972. At that deposition, when plaintiff's counsel attempted to ask a hypothetical question of Dr. Berry which involved the diagnosis of trauma-related injury indicated by Dr. Leonard, defense counsel objected on the basis that Dr. Leonard, if called to testify, would testify that the alleged report was not actually his findings as he had not used the term "aggravated by trauma" in his findings. There was some testimony at the trial that the words "aggravated by trauma" may have been put into the report at the Canfield Clinic by a clerk who regularly prepared reports to be sent to insurance companies. This situation came to a head on the second or third day of trial when plaintiff's counsel proposed to put Dr. Berry's deposition into evidence. To the hypothetical question propounded by plaintiff's counsel, Dr. Berry had answered in his deposition (he was not subject to subpoena, being a Wisconsin resident) that in his opinion the preexisting arthritis for which he treated the plaintiff was aggravated by the automobile accident. He gave as his reason for this conclusion that "when you have a pre-existing type of arthritis made painful or the area being made painful subsequent to injury I think it's reasonable to conclude there's a causal relationship."

Defense counsel objected to the hypothetical question to Dr. Berry and argued in chambers that it could not be used because it included the opinions and beliefs expressed in the Canfield Clinic report as being Dr. Leonard's opinion and Dr. Leonard had partially repudiated the clinic report which had not been signed by him. Plaintiff's counsel argued that Dr. Berry's own deposition clearly showed it was his opinion that there had been a condition preexisting the automobile accident, but defense counsel objected that Dr. Berry's statement to that effect was necessarily based on Dr. Leonard's report, which Dr. Leonard had in part repudiated, and it was not possible to determine at the time of the trial, December 1978, to what extent Dr. Berry may have been influenced in giving his deposition shortly before trial, by Dr. Leonard's supposed earlier report. Dr. Berry could not actually diagnose the relationship between the accident of April 24, 1972, and the existence of arthritis more than six years after the accident. The court, after consideration, ruled that the hypothetical question as propounded to Dr. Berry by plaintiff's counsel in the deposition was too bound up with Dr. Leonard's partially

repudiated clinical report to be allowed into evidence. The court said it could not determine to what extent Dr. Berry had relied on Dr. Leonard's supposed opinion in his answer to the hypothetical question.

Plaintiff's counsel then asked for a continuance of the trial, then in its third day, to again depose Dr. Berry and ask a hypothetical question not based on Dr. Leonard's opinion as to the preexisting arthritis. The court, however, refused to continue the trial because it would involve a difficult reassignment of a previous trial commitment and also because he thought that plaintiff's counsel had been somewhat dilatory in asking for the continuance since he had been alerted at least a week previously as to the discrepancy in Dr. Leonard's report. Counsel then asked the court to accept immediate notice of a new deposition of Dr. Berry to be taken that night at Dr. Berry's hospital in Beaver Dam, Wisconsin. This, however, was a two-hour drive from Rockford plus the time of taking the deposition and defense counsel objected to making the effort to attend the proposed new deposition and then resume trial the next morning. The court, after consideration of the matter, declined to accept notice of the proposed deposition to be held that night. Plaintiff's counsel nevertheless went to Beaver Dam and procured Dr. Berry's affidavit in which Dr. Berry said his opinion as to the plaintiff's preexisting arthritis had not been influenced by Dr. Leonard's opinion as expressed in the clinic report; however, the trial court refused to admit the affidavit into evidence.

The trial then continued and the jury brought in a verdict as follows:
" 'We, the jury, find for the plaintiff and against the defendant. We assess the damages in the sum of $5000.00 (Five Thousand Dollars).' However, we the jury feel the negligent action taken by the defendant was due to circumstances beyond his control precipated [*sic*] by the action and/or driving by Don Listerud."

In this appeal the plaintiff contends (1) the damages awarded were so inadequate as to require a new trial on the issue of damages only; (2) the court erred in not allowing the hypothetical question to Dr. Berry and his answer thereto to be introduced into evidence; (3) the court erred in not allowing a new deposition to be taken from Dr. Berry; and (4) the court erred in certain evidentiary rulings.

The plaintiff supports her contention that the jury award was grossly inadequate by pointing out that from the evidence presented at trial the jury could have found that the plaintiff had incurred medical bills of over $12,000. It is true that medical bills of that amount were in evidence, however, from the total testimony at the trial it appears that the plaintiff had complained of back trouble and had been treated by Dr. Riordan for it in 1970. Moreover, the question of what extent the plaintiff's arthritis, if preexisting, was aggravated by the accident of April 24, 1972, was never

clearly answered. The doctors obviously could not determine that point at the time of the trial, and there was no satisfactory evidence that if the arthritic condition existed before the accident all of the plaintiff's medical expenses were due to the aggravation of the arthritis and would not have been incurred except for the accident. The jury might reasonably have concluded that to some extent the condition was a natural progression of the preexisting arthritis. The plaintiff was diagnosed immediately after the accident as having a massive bruise on her lower left leg and left shoulder and contusions and abrasions on her back. She was discharged from the hospital with a bill of only $78. However, she went to the doctor a couple of months later complaining of back pain. Long before the accident, in 1970, she had been diagnosed by Dr. Riordan as having "osteoporosis, degenerative joint disease and metabolic disease and multiple myeloma to be ruled out along with the possibility of catagenetic disease." Dr. Riordan first saw her in June of 1970 in the emergency room and testified that his records indicated a "history that she had back pain for up to two years [later amended to two weeks] previous to coming to the emergency room." Dr. Leonard's 1972 diagnosis following the accident was (as corrected by him) "moderate osteoarthritis lumbar spine, aggravated by trauma. Atherosclerosis, descending aorta." In view of the history of back trouble before the accident and the fact that the accident admittedly was not the cause of the arthritic condition, it is not at all clear that the jury award of $5000 was grossly inadequate.

On the other hand, if, as contended by the plaintiff, this was a compromise verdict, the compromise appears to have been as to liability, not as to damages. The notation on the jury verdict form to the effect that the jury felt that the defendant's negligence was due to circumstances beyond his control and was precipitated by the action and/or driving of Don Listerud, clearly indicates that the jury was uncomfortable with a finding of liability on the part of the defendant and wished to absolve him of blame in a moral, if not a legal sense. Thus it appears that the jury was more confused and uncertain as to liability than as to damages, and if there was a compromise and an inadequate award resulted, it reflects an uncertainty as to liability and was a compromise on that point rather than on the dollars and cents allowable for medical expenses. While the jury's gratuitous comment in returning the verdict does not have the legal force of a special verdict responding to an interrogatory propounded by the court, it was a logical reaction of the jury, explaining their limited award.
■■ ■ The plaintiff, however, has asked for a new trial on the issue of damages only, and the law is very clear that a new trial will not be granted as to damages only where the jury's compromise was on the question of liability. Beginning with the case of *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, and running consistently up to and including the

recent case of *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, the cases have held that where the indications are that the jury compromised on the question of liability, a new trial generally may be granted for good reason and to do justice, but not a trial on the issue of damages only. This court has so held repeatedly. (*Hamas v. Payne* (1969), 107 Ill. App. 2d 316; *First National Bank v. Szwankowski* (1969), 109 Ill. App. 2d 268; *Maguire v. Waukegan Park District* (1972), 4 Ill. App. 3d 800.) Since in this case it appears that there was a question in the jury's mind as to liability, we think the trial court was correct in denying the motion for a new trial on the limited question of damages.

■■ While the question as to the rejection of the plaintiff's hypothetical interrogatory to Dr. Berry is a close one, we think the trial court's ruling had a rational basis and was a decision well within his discretion. The actual hypothetical question put to Dr. Berry and answered in his deposition involved a condition not warranted by the evidence in the light of Dr. Leonard's testimony and was thus subject to objection, based on the court's judgment. It is obvious from the report of proceedings that the court very conscientiously considered all aspects of the matter and finally rejected the question as possibly intending to elicit an answer based on an incorrect hypothesis. The question involved a critical point of proof in the plaintiff's case. To prove her case she attempted to show that although she had a preexisting arthritic condition, she had no pain or symptoms from it, and that her later pain and symptoms all stemmed from and would not have occurred but for the accident of April 24, 1972. In proving her case she presented a hypothetical question which the trial court felt somewhat exceeded the bounds of the facts established in evidence. We think his ruling was in accord with the wide latitude usually given to the trial judge in passing on the propriety of hypothetical questions. See McCormick, Evidence §14, at 33 (2d ed. 1972).

■■■ Objection is also made to the trial court's rulings denying a request for continuance of the trial in order to take a new evidence deposition from Dr. Berry and after that was denied, the trial court's quashing of the immediate oral notice of deposition to be taken at Beaver Dam, Wisconsin. Since Beaver Dam was a 2- to 2½-hour drive from Rockford and to take Dr. Berry's deposition that evening would have required driving to Beaver Dam, attending the deposition and then driving back and being in court the next morning in time for trial, we think it was not unreasonable for the court to have quashed the oral notice of deposition. As to the continuance of the trial itself, the court indicated it would interfere with the trial schedules already set and in any event the motion was dilatory since plaintiff's counsel was aware of a possible problem in connection with Dr. Berry's hypothetical question at least a week before trial.

■■ ■ The plaintiff also contends that the trial court erroneously permitted defense counsel to elicit hearsay replies from the plaintiff. We do not think the answer "no" to the question, "Do you recall him mentioning osteoporosis?" or "degenerative arthritis of your back?" amounted to hearsay and the trial court did not err in overruling the objection based on hearsay. Moreover, the testimony of Dr. Riordan more or less corroborated the information sought to be elicited from the plaintiff, thus the testimony was not seriously prejudicial. We also regard as harmless error the reading of the plaintiff's deposition at trial. The plaintiff asserts that this was erroneous and prejudicial because her deposition was substantially in accord with her testimony and, therefore, was not impeaching whereas the jury was led to believe that it was. While we agree that a careful reading of the plaintiff's trial testimony reveals no significant inconsistency with her deposition, the deposition was slightly more optimistic in that in the deposition the plaintiff said, "There was not too awful much difference" in her back following the operation. She said in her testimony that it was better, "to a certain extent," in that she "could get around better." Even if the one statement did not actually impeach the other, we think the prejudicial effect was minimal and certainly did not amount to reversible error in the context of all the medical testimony adduced at trial.

■■ ■ The plaintiff contends the trial court erroneously permitted cross-examination beyond the scope of the direct examination in that Dr. Leonard testified on direct that the plaintiff's arthritis predated the accident, and defendant's attorney asked whether there was any causal connection between the arthritis and the accident, to which plaintiff objected and was overruled. Even though it appears that the question exceeded somewhat the scope of direct examination, it was not a seriously prejudicial matter. Another objection to the court's evidentiary ruling was in regard to the effect of Schmoral's nodes and a thoracic condition, which Dr. Domers testified could cause back pain in the middle back. Plaintiff says that since the pain which she was complaining about was in her *lower* back, the question about Schmoral's nodes was confusing to the jury, irrelevant and prejudicial. Since the plaintiff had introduced evidence of back pain, it does not seem significantly prejudicial to ask questions about a disorder which causes middle back pain as opposed to an ailment which is responsible for lower back pain. We do not regard it as seriously prejudicial in the course of cross-examination.

Finally, the plaintiff complains that the court abused its discretion in allowing defense counsel to ask questions of the plaintiff's doctor, suggesting the plaintiff was taking tranquilizers to counteract a nervous condition caused by her job at Admiral. The doctor replied that he

prescribed a medicine containing a tranquilizer but he did not relate it to her job. However, on direct examination under section 60, the plaintiff herself testified the doctor had prescribed Valium for her -and to the question, "Did he prescribe Valium for you because you were nervous and had a nerve wracking job?" she answered, "That's what I told him so I suppose so."

■■ ■ Bearing in mind that the plaintiff claimed she was off the job at Admiral for some time because of a pain in her back caused by the accident, we think cross-examination of the doctor as to the connection between her job and taking tranquilizers was within the realm of cross-examination and in any event any suggestion that the job at Admiral was nerve wracking and that the doctor prescribed pills to overcome its effect, was confirmed by the plaintiff's own testimony under section 60. The remark in closing argument that the plaintiff was "not happy on the job," while perhaps objectionable on the ground that no one had so testified, was not so impermissible an inference in closing argument as to be cause for reversal, in view of the plaintiff having opened the door with the testimony about her reason for being absent from her job.

This leaves for consideration the defendant's cross-appeal based on the jury's extralegal finding that the accident was caused by "circumstances beyond his control precipated [*sic*] by the action and/or driving by Don Listerud."

■■ ■ The defendant contends this amounts to a special finding by the jury and such special finding should control the general verdict, where such special finding is inconsistent with the general verdict. However, in our opinion, the gratuitous remarks of the jury as to the ultimate responsibility for the accident being that of Don Listerud do not amount to a special finding in the legal sense. The special finding inconsistent with the general verdict which is sufficient to upset the general verdict must, we think, be a finding in answer to a special interrogatory submitted by the court in accordance with section 65 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 65). In short, we do not believe there can be a legally sufficient special finding unless there is first a special interrogatory. Here we have the anomaly of an answer without a question. It should be noted that section 67 of the Civil Practice Act is construed by the Committee Comments as requiring copies of instructions to be given to opposing counsel in advance (Ill. Ann. Stat., ch. 110, par. 67, Joint Committee Comments, at 297 (Smith-Hurd 1968)), which could not be done if the jury was allowed to make a special finding without the court having submitted a special interrogatory. While a special finding in regular form, responsive to a court-approved special interrogatory which is inconsistent with the general verdict, controls the general verdict, a spontaneous finding by the jury on its own initiative may be disregarded,

especially where the jury's remarks themselves are inconsistent. In this case the jury found "for the plaintiff and against the defendant." Their subsequent remark that they "feel" that the negligent action taken by the defendant was due to circumstances beyond his control, does not amount to a finding inconsistent with the general verdict and may be looked upon as mere surplusage. These remarks did not have the legal force of a special verdict. While the jury's remarks are enlightening as revealing their state of mind as to liability and indicate a compromise verdict based on questionable liability, they do not amount to a special finding, and we are in accord with the trial court's denial of a new trial based on the theory of an inconsistent verdict.

The judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD and LINDBERG, JJ., concur.