E.J. McKERNAN COMPANY *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. JOSEPH J. GREGORY *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 2—92—0735

Opinion filed November 17, 1993.

Rathje, Woodward, Dyer & Burt, of Wheaton (Gary L. Taylor, of counsel), for appellants.

Tressler, Soderstrom, Maloney & Priess, of Chicago (Jay H. Tressler, of counsel), and John P. Lynch, Jr., of Tressler, Soderstrom, Maloney & Priess, of Wheaton, for appellees.

JUSTICE COLWELL delivered the opinion of the court:

Defendants Joseph J. Gregory, Mark Gregory, Gregory Associates, Inc., Donald Beardsworth, Douglas Beardsworth, D.A. Beardsworth Associates, Inc., LITHO-OFF, Inc., and CAN-ERASE, Inc., appeal

from the jury's decision in favor of plaintiffs', E.J. McKernan Company's and Edward J. McKernan's, claims of breach of fiduciary duty and tortious interference with a business expectancy. Defendants also appeal the jury's verdict against them on their counterclaim alleging breach of contract. Plaintiffs appeal from the trial court's order denying a jury trial on their patent claim and claim for attorney fees. We affirm in part and reverse in part.

## I. FACTUAL BACKGROUND

Edward J. McKernan incorporated E.J. McKernan Company (the Company) in 1960 to manufacture, sell, and distribute aerosol products. He hired Joseph Gregory in 1964, a man he had known since 1946 and had previously worked with. Edward had recently contracted with Union Carbide to become an exclusive manufacturer's representative in California. Joseph agreed to run the Midwest sales accounts from the Illinois office. He was made secretary of the Company and became a member of the board of directors and a registered agent in 1965. Joseph received a salary and bonuses based on the Company's profits, which were equally shared between him and Edward.

Edward started the "Clearing House" business at or around 1969 on the West Coast. The Clearing House began as a division of the Company, distributing used or surplus aerosol products and packaging equipment which were purchased from one company and sold to another. In addition to other aerosol products, the Clearing House sold a large amount of "prime cans," which are aerosol cans without lithography that can be sold on the surplus market.

Edward hired Donald Beardsworth in 1970 to represent the Company on the East Coast. Donald owned a manufacturer's representative company in Connecticut. Donald became vice-president and a director of the Company in 1974 and began sharing the Company's profits in 1977.

The Clearing House published a monthly catalogue and a master list of buyers and sellers dealing with aerosol products. The information in the catalogue was kept confidential in order to discourage companies from buying and selling directly to each other without going through the Clearing House. Both Joseph and Donald were entrusted with the master list which contained the identity of the buyers and sellers as well as other sales information. The master list was later changed to an "800" telephone number which Joseph and Donald were authorized to call.

The Company moved to La Grange Park, Illinois, and became a tenant of a building at 1013 East 31st Street that Joseph and Edward bought with their wives in 1970. The Company remained in this building until May 1981.

Joseph came into contact with Jack Randolph in 1971. Randolph was using a process to remove lithography from aerosol cans by heating them and then brushing off the paint. Edward and Joseph decided to acquire Randolph's rights to this process and use it for the Company since it would make more cans available for sale. An agreement was drawn up in which Randolph assigned his rights in the process to Joseph and Edward. Randolph was to receive 15% of the net profits from the use of the process and was paid $500 when the assignment was executed. Edward and Joseph have differing opinions on the assignment of the process, and this issue is the basis for plaintiffs' appeal. Edward contends that the assignment was intended to be to Edward and Joseph for the benefit of the Company. Joseph claims the assignment transferred ownership to Edward and himself as individuals. The delitho process was used exclusively by the Company after the assignment. Both Joseph and Randolph were designated as co-inventors of the patent when it was issued.

Joseph worked to make the delitho process commercially feasible for the Company. Expenses for development of the process were paid for by the Company. When the process became operational, Joseph began to manage the "Delitho Division" of the Company in 1972 in Illinois. Delitho Midwest, as it was later known, became involved with removing lithography from aerosol "prime" cans and reselling them on the surplus market.

Edward and Joseph entered into another agreement on December 4, 1974, whereby they individually as partners obtained title to the delitho equipment for $1. The agreement stated that the Company was to pay Edward and Joseph $200 per month "on a retainer basis and other expenses incurred on behalf of the Company." The evidence indicates these payments were never made. The agreement was to be renewable on a year-to-year basis and could be cancelled on a 90-day written notice.

After Donald was hired, the Company was run out of three locations with Edward on the West Coast, Joseph at Delitho Midwest, and Donald at Delitho East, which was developed in 1977. The manufacturer's representative business, the Clearing House, Delitho Midwest, and Delitho East all had separate bank accounts and were run as separate entities under the Company's corporate umbrella. Edward, Joseph, and Donald would convene each year at the Chemical Specialties

Manufacturer's Association Convention in Illinois to talk about business and the distribution of Company profits.

Timothy McKernan, Edward's son, began working for the Company in July 1977. He eventually became treasurer. Mark Gregory, Joseph's son, began working for the Company in April 1976. He became assistant treasurer in 1977. Douglas Beardsworth, Donald's son, worked summers for the Company and began working full-time in 1980. He was a signatory on the Delitho East account.

The Company changed from a cash basis to an accrual system of accounting in or around late 1978. This change added equity to the Company and caused the net worth to rise considerably. Joseph and Donald became concerned that they would not be entitled to share in this newly accumulated net worth; therefore, they expressed a desire to purchase stock in order to become actual partners. Edward, Joseph, and Donald met on May 17, 1979, in Illinois at the Company accountant's office. The three entered into a stock purchase agreement whereby Edward allegedly agreed to sell one-third of the Delitho Division to Joseph and Donald each for $39,013, based on the belief that there were only 100 shares outstanding. Edward testified he was pushed to sign the agreement and only agreed to when he realized the agreement did not convey 33% of the shares to each person. The manufacturer's representative businesses and the Clearing House were not part of the consideration. The deal was abandoned after it was determined that there were 1,000 shares of the Company actually listed and Edward refused to revise the agreement. Edward denies ever agreeing to sell one-third of any part of his corporation.

The parties entered into another agreement in October 1979 regarding future operation of the Company. Up to this point, Edward, Joseph, and Donald had worked only for the Company and drew salaries plus year-end bonuses from net profits. This new agreement provided that Joseph and Donald now would start their own manufacturer's representative companies in their respective territories. Joseph and Donald would continue to represent the Clearing House. Their companies, Gregory Associates and Beardsworth Associates, would manage Delitho Midwest and Delitho East, respectively. In return, their companies would receive a management fee of $2,500 a month and commissions on each account for which they were responsible. Joseph and Donald were still eligible to receive year-end profits of the Company. If Joseph or Donald developed a listing for the Clearing House, he was to receive one-third of the gross profit. If either also sold an item for the Clearing House, he would receive an additional one-third. The remaining one-third would go to the Clearing House.

The Delitho Division was to continue as a separate entity under this agreement. Year-end profits from Delitho East were to be 50% to Donald, 25% to Edward, and 25% to Joseph. Year-end profits from Delitho Midwest were to be 60% to Joseph and 40% to Edward. Although the parties acted autonomously in their respective territories, they remained as officers and directors of the Company.

Timothy became concerned over the financial condition of Delitho East early in 1980. He discovered that labor costs were going up but sales were down dramatically. Edward and Timothy met with Donald and Douglas during July 1980 in Connecticut and asked them to sign a secrecy agreement regarding the confidentiality of the Clearing House information. Donald and Douglas refused to sign, saying they were friends and it was not necessary.

Joseph notified Edward in February 1981 that he was going to take a profit distribution of $15,600. Edward testified he was not notified of the withdrawal until after Joseph had taken the money. Joseph received a letter on or around April 3, 1981, from Timothy asking Joseph not to take any further distributions of profits until the parties met on May 12, 1981, and the profits could be determined. Nonetheless, Joseph took a further distribution, through Gregory Associates, on April 24, 1981, in the sum of $25,656. Donald took a distribution on May 9, 1981, in the sum of $19,308.

Timothy entered the Company offices run by Joseph on May 10, 1981, at 5:30 a.m. and removed furniture, equipment, and documents he believed were owned by the Company. Joseph and Donald received notice thereafter that they had been terminated as managing agents of the Delitho Divisions. Plaintiffs filed a petition for preliminary injunction on May 8, 1981, against all defendants seeking to prevent them from using the delitho process. Temporary injunctions were entered against all defendants. Joseph and Gregory Associates filed a counterpetition or counterclaim on June 10, 1981, seeking: (1) payment of sums due under the December 4, 1974, agreement; (2) payment of a percentage of the profits of Delitho Midwest and Delitho East pursuant to the October 10, 1979, agreement; (3) damages for Timothy's trespass to the office of Gregory Associates on May 10, 1981; and (4) breach of contract by Edward, relative to the May 17, 1979, agreement wherein Edward agreed to sell one-third of the stock to Joseph.

Joseph incorporated LITHO-OFF, Inc., in July 1981. LITHO-OFF utilized the delitho process, served many of the same customers as Delitho Midwest, and hired the prior employees of Delitho Midwest. Donald incorporated CAN-ERASE, Inc., and also engaged in business

as a competitor of the Company's delitho operation. CAN-ERASE employed three former Delitho East employees.

The Company filed a consolidated complaint for equitable and legal remedies/amended petition for equitable relief on August 7 or 8, 1984, seeking: (1) an order restraining defendants from using the delitho process patents; (2) a declaration that plaintiffs were the owner of those patents; (3) damages for breach of fiduciary duty; (4) damages from defendants for conversion of patent rights; and (5) tortious interference with plaintiffs' business expectancies. The court allowed plaintiffs to file a jury demand, but reserved ruling on this issue. The trial court continued the motion for leave to file a jury demand generally but ordered that the issue of patent ownership be set down for hearing without a jury.

Donald and Beardsworth Associates filed a counterpetition for recovery of the sums allegedly due for a percentage of the Delitho East profits and commissions as per the October 1979 agreement. Joseph and Gregory Associates filed an amended counterclaim asking for declaratory judgment relative to the ownership of the delitho patents, and for profits and salary due to him from the Company.

Plaintiffs filed a first amended consolidated complaint on March 29, 1985, adding LITHO-OFF and CAN-ERASE as defendants. The court denied another request by the Company that the issue of patent ownership be submitted to a jury. The Company filed a motion for interlocutory appeal on June 24, 1986, to determine whether its request for a jury trial was appropriately denied. This court denied the Company's motion. The issue of patent ownership was tried without a jury in June 1986, and the trial court determined that the ownership was in Joseph and Edward individually.

The jury trial commenced on January 13, 1992, on the remaining counts. Plaintiffs presented evidence to support its claim that Joseph and Donald operated other personal businesses out of the Company's offices.

Joseph testified that BCL Associates, Inc., rented office space at 1013 East 31st Street and had a phone installed. When BCL left the building, Joseph kept the telephone line for use by the Company, which paid for the line from June 1976 to August 1979 until it was reassigned over to Gregory Associates. The Company bank account was used to pay BCL phone bills in the amount of $901.25.

Joseph was involved in a company named "Brite Ideas" in which he invested at least $1,000. Joseph testified that he and Edward were always looking for new ventures to enlarge the business. Joseph stated that he was to receive a 25% commission on sales made by

Brite Ideas. However, he admitted that no more than $200 of Brite Ideas commissions were paid to the Company although records indicate he paid freight and other expenses incurred by Brite Ideas out of the Company's bank account. Brite Ideas stored its goods at the Delitho Midwest plant. The Delitho Midwest check register showed that a check was written to Brite Ideas for advertising expenses; however, the check itself was actually made out to and cashed by Joseph. The money paid to Brite Ideas and to Joseph totaled $1,785.

Joseph and Mark entered into a partnership called J & M Associates on July 5, 1979, and identified the Company offices as its place of business. The evidence indicated that Joseph and Mark deposited commissions paid to them by other companies into this account at a time when the services they provided as manufacturer's representatives were done on behalf of the Company and were to be deposited into the Company account. For example, Joseph admitted that, although $44,435.24 was paid to the Company by Imperial Plastics, only $20,643 was deposited into the Company account. The evidence indicates Joseph and Mark retained the balance. Joseph alleges he was entitled to such funds pursuant to an agreement between him and Edward in February 1979 whereby the party developing a commission would be entitled to any "overage." Joseph defined "overage" to be any amounts left over from receipts for the manufacturer's representative business over and above expenses. Edward denied any such agreement existed.

Joseph bought a house in 1975 and owed money on this purchase to James Bernardini. Joseph signed Company checks made payable to "George Scott" for "commissions." Joseph did not recall the identity of George Scott at trial, but stated that these payments constituted "professional gratuity" to Bernardini for sales that Delitho Midwest received through Illinois Bronze Powder Company. Joseph admitted the Company had never employed George Scott. Evidence showed these checks, totaling $2,218.75, were endorsed by Scott over to Bernardini. Joseph explained that he paid "kickbacks" to Bernardini; however, Joseph previously testified he had never paid "kickbacks."

Joseph wrote a Company check to Ron Hamity for $5,000 for sales "commissions." Joseph admitted the Company never employed Hamity. Another check, written to Caribbean Business Consultants with a memo to "commission to Ron Hamity" was also written on the Delitho account for $6,700. Caribbean Business Consultants negotiated the check. Joseph explained that Hamity owned Caribbean Business Consultants. Joseph claimed the money consisted of "overages" on Company sales. He would place such overages on a sale at Ham-

ity's request and then return the money so Hamity could deposit the money in a United States bank account without obtaining approval from the Jamaican Monetary Control. Edward testified he knew nothing about these transactions.

Joseph and his wife traveled to Australia in 1977 on the Company's expense account to promote the delitho process and contact other prospects for the Company. Joseph corresponded with prospective customers in his name and on his personal stationery, making no reference to the Company, a practice which violated Company policy.

Gregory Associates became a tenant in October 1979 at 1013 East 31st Street, the building that Joseph and Edward bought together in 1970. Joseph charged Gregory Associates $150 per month rent for two offices but charged the Company $170 for one office. Joseph explained that this was because he managed the building; however, he admitted he was paid a management fee by the Company. Edward stated he was not aware of the rental rates.

Plaintiffs presented evidence to show that after Joseph and Donald were allowed to run their own manufacturer's representative businesses as per the October 1979 agreement, both Joseph and Donald accommodated sales of surplus goods without putting the sale through the Clearing House, knowing such actions were in direct competition with the Clearing House and in contravention of the October 1979 agreement. Gregory Associates and Beardsworth Associates were not in the business of selling surplus goods as was the Clearing House, and Joseph and Donald remained as representatives of the Clearing House until their termination in 1981. They accessed such data through the Company's confidential information system.

One such transaction concerned Malter International in 1981. Malter sent a purchase order for $18,018 worth of cans to the Company. Joseph told Malter that, although their order came to the Company, it would be filled by Donald's company, Beardsworth Associates. The cans were shipped to Joseph and billed by Beardsworth Associates, despite the fact that the order came in to the Company. Joseph admitted that this violated the October 1979 agreement, but said he considered himself an independent contractor. Similar transactions were made with Walter Cruse Packaging Company in 1979. Joseph explained that Cruse had equipment which Sycamore Corporation wanted to purchase. Joseph received $1,600 for putting the deal together. This transaction was not run through the Clearing House and the funds were placed into the Gregory Associates account.

Joseph also began dealing with Loeb Equipment Company, a competitor of Clearing House, after Loeb had sent quotations for sale of

equipment to the Company in 1980. Joseph never told Edward about the quotations and began dealing with Loeb on behalf of Gregory Associates. Joseph received commissions from Loeb and deposited them into Gregory Associates accounts or other personal accounts. Joseph testified that Gregory Associates received an $825 commission from Loeb because they were in need of a labeler, which Clearing House did not possess, and that Gregory Associates put Loeb in touch with a company that did have a labeler. Joseph could not recall how many transactions he carried out for Loeb while being paid to represent the Clearing House.

Joseph also directly competed with Clearing House by proposing a sale of cans through Gregory Associates to Tech Spray in January 1981. Joseph admitted his proposal was in direct competition with the Clearing House.

Joseph testified that a company named West Penn received a purchase order from the Delitho Division of the Company for screw caps that were billed to the Company. He could not explain why the Company would buy 3,500 screw caps. The caps were sold to the Company but shipped to Gregory Associates. The Company also purchased $1,307 worth of plastic caps from Imperial Plastics, again to be shipped to Gregory Associates. The Company paid for the caps; however, the check register on the transaction states that it was a transfer of funds to "Columbus Trading Company."

Hysan Corporation sent a purchase order to the Company on May 22, 1980, for delitho processing on 17,740 cans. However, the evidence showed that Gregory Associates sent an invoice to Hysan to charge them for the services requested of the Company. Joseph explained that the cans were shipped to another company for processing and Gregory Associates paid this bill; thus, Gregory Associates needed to be reimbursed for this expense. However, Joseph admitted the Company could have done the processing.

The Delitho Division of the Company sold goods to Carlos Products of Jamaica around early 1980 for $17,222.88. The invoice shows that $6,557.65 was paid on the order with a remaining balance of $10,665.23. At the foot of the invoice is the notation: "Write off—consider paid. We owed same amt. for commission." Joseph testified that this invoice should have said to write off $656.23 because there was an additional payment made on the invoice. Joseph stated that he traveled to Miami, where he collected $10,000 in cash from the owner of Carlos Products. Joseph gave the cash to his son-in-law, who deposited it and gave Joseph a check made payable to the Company for $9,975, which he deposited into the Company's account. Joseph paid

his son-in-law $25 for the trouble of writing the check. However, the only evidence that this sum was deposited into the Company account was a deposit for $9,975 marked to the Columbus Trading Company. The Company accounts receivable continued to reflect an unpaid balance from Carlos Products while the accounts payable journal referenced to $10,665.23 as being "written off." Joseph explained this as a secretarial mistake.

Joseph took a $15,000 loan from the Company in 1979 that was never repaid. The Company check register also indicates a check was written to Gregory Associates in February 1981 for $2,500 for "commissions." Joseph wrote a check to Gregory Associates in February 1981, for $15,600 for "distribution of profits" before Company profits were determined. Joseph did not agree with Timothy's April 1981 request not to withdraw commissions. After Timothy's second request not to take any further payments, Joseph signed a Company check to Gregory Associates in April 1981 for $25,656 for 1980 "commissions." Joseph was terminated on May 11.

Delitho Midwest was located in a space which had been on a year-to-year written lease. The owner terminated the lease in May 1981 because Joseph had failed to renew the lease and had allowed it to lapse into a month-to-month tenancy. LITHO-OFF took over the premises on a yearly written lease after the Company left. LITHO-OFF began operations around July 1, 1981, and by July 31, 1981, had accounts receivable of $9,348.60.

Like Joseph, Donald remained a representative of the Clearing House under the October 1979 agreement. Beardsworth Associates was to provide the Company with the same services previously provided by Donald in managing Delitho East. However, when Beardsworth Associates was formed, it used the same telephone number and address as that used by the Company and the office would answer calls as "Don Beardsworth." Donald borrowed $7,500 from the Company in 1979 which was never repaid.

Beardsworth Associates represented Turco, Inc., as a manufacturer's representative. Donald stipulated at trial that Beardsworth Associates received $4,438.50 after October 1979 for commissions on sales which had occurred before October 1, 1979. Such commissions should have been deposited into the Company account. Donald testified that he did not know how many transactions of surplus goods he oversaw outside the Clearing House. He said he would be able to determine such information with purchase orders, invoices and the Beardsworth Associates check register; however, defendants failed to produce these requested documents at trial.

Donald testified in regard to a shipment of delithographed cans shipped on a purchase order from Jet Air Corporation. This was invoiced for the Company coming out of Delitho East. On the same date, another shipment of delithographed cans was sent out invoiced for $3,776 by Beardsworth Associates to Jet Air from the Company plant, despite the fact that Beardsworth Associates typically dealt in prime cans, not delithographed cans. Donald denied that he sold these cans out of the Company inventory and explained that he did not think the order actually contained delithographed cans.

Donald's son, Douglas, was a student at Georgia Technical in Atlanta before becoming a full-time employee. While at school, Donald paid Douglas $150 per week out of Company funds during a time period where Douglas only recalled making one personal sales call and one phone call for the Company.

After Timothy and Edward were unable to get Donald to sign the secrecy agreement, the parties agreed that all leads regarding surplus goods would be forwarded to the Clearing House. However, the evidence indicates Donald competed with the Clearing House thereafter. Donald testified he did not know how many deals in surplus goods he and Douglas performed outside the Clearing House. Donald failed to produce many of the purchase orders, invoices, or check registers he used as requested by the Company. In fact, the Company received very few of the records requested for this litigation from the Delitho East operation. Donald stated in a 1982 deposition that the records still existed and then later admitted again that they may still exist.

The Company check register indicates a check was written out of sequence to Beardsworth Associates by Douglas for $19,385 on May 8, 1991, three days before Donald's termination. However, the bank showed these funds were deposited on May 11, the same day as his termination.

Donald had discontinued Delitho East's yearly written lease in 1977 or 1978 and continued on a month-to-month tenancy. After Donald and Douglas were fired from the Company, the Company's lease was cancelled and CAN-ERASE, Inc., Beardsworth's new delithographing company, moved into the premises under a yearly written lease. CAN-ERASE serviced many of the same customers as the Company had serviced and employed former Company employees. The Company was unable to keep Delitho East running and decided to consolidate delitho operations in the Midwest with Timothy running the operation.

The trial court denied defendants' motion *in limine* to bar the testimony of plaintiffs' damage expert. Joseph Trindl testified that for

his damage analysis in this case he charted the Clearing House and delitho sales history to determine what Company sales should have been. He determined that total damages for the Delitho Division were $1,531,350 and $355,319 for the Clearing House. The trial court sustained defendants' objection to Trindl's apportionment of damages between the Beardsworth defendants and the Gregory defendants.

The jury returned verdicts in favor of plaintiffs and against all defendants for compensatory damages totaling $1,067,000 and punitive damages of $420,000. The jury found in favor of plaintiffs on all of defendants' counterclaims except for count I of Joseph's counterclaim alleging conversion and rent due under the December 4, 1971, agreement for which Joseph received a verdict of $5,400.

Defendants filed a post-trial motion which the trial court denied. Defendants appealed and plaintiffs cross-appealed from the order of June 30, 1986, determining the patent ownership.

## II. ANALYSIS

■ We first address plaintiffs' motion to strike defendants' statement of facts contained in their appellate brief. Plaintiffs contend that defendants' statement of facts is in direct contradiction to Supreme Court Rule 341(e)(6) (134 Ill. 2d R. 341(e)(6)) since it is "replete with argumentative and misleading statements, improper editorial comment and erroneous conclusions of law" and "frequently makes inappropriate references to the pages of the record purportedly supporting the 'facts' set forth in the brief." Defendants filed an objection to this motion.

Where this court's ability to review the issues in a case is hindered by the content of the statement of facts, the statement of facts shall be stricken. (See *Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 396.) While we do not completely disagree with the plaintiffs' criticisms of defendants' statement of facts, we will consider a brief while disregarding its inappropriate content where, as here, no flagrant violations of the rules hinder our review. (*City of Highwood v. Obenberger* (1992), 238 Ill. App. 3d 1066, 1073.) Therefore, we deny plaintiffs' motion to strike the statement of facts.

### A. BREACH OF FIDUCIARY DUTY

Defendants first contend that the verdicts were contrary to the manifest weight of the evidence. Defendants apparently argue they were not fiduciaries of the Company, or, if they were, they did not breach their duty to the Company. The trial court granted a directed

verdict as to LITHO-OFF and CAN-ERASE on this count. Plaintiffs assert that defendants waived this issue since they made no such challenge to the jury's finding in their post-trial motion. We hold that, although defendants do only refer generally to the issue of fiduciary duty in the post-trial motion, this claim is inclusive in their arguments as to the sufficiency of the evidence.

A jury verdict will not be overturned unless it is against the manifest weight of the evidence, *i.e.*, the opposite conclusion is clearly evident or the findings of the jury are unreasonable, arbitrary, and not based on the evidence presented. (*First Midwest Bank v. Denson* (1990), 205 Ill. App. 3d 124, 128.) This court should not, in reviewing the record on appeal, act as a second jury and attempt to weigh or evaluate the evidence or the credibility of the witnesses. *Denson*, 205 Ill. App. 3d at 129.

■ We conclude that defendants were fiduciaries and that they breached their duties to the Company. Corporate officers owe a fiduciary duty of loyalty to their employer not to: (1) actively exploit their positions within the corporation for their own personal benefits; or (2) hinder the ability of the corporation to conduct the business for which it was developed. (*Veco Corp. v. Babcock* (1993), 243 Ill. App. 3d 153, 160; *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 760-61.) A corporation's fiduciary is not permitted to use corporate assets for his own personal gain or take advantage of business opportunities which are considered to belong to the corporation as far as the fiduciary is concerned. (*Graham*, 111 Ill. App. 3d at 761-62; see also *Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 359.) The burden of proof is on fiduciaries to establish the fairness of those transactions where they acquired the assets of the corporation. *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 291.

■ Defendants contend there was no evidence they breached their fiduciary duties before the October 1979 agreement, that they owed no duty after October 1979, and are not liable for conduct thereafter. As to the first assertion, there is compelling evidence that defendants used Company funds for their own personal gain prior to October 1979. Plaintiffs presented a considerable amount of testimony as to Joseph's endeavors with George Scott, Brite Ideas, Ron Hamity, and others as detailed previously. The jury could have decided not to believe Joseph's and Mark's various explanations for these transactions. If these transactions are taken as true, Joseph would clearly be accountable as an officer and director of the Company, as would Gregory Associates. Mark also acted as an agent of the Company and therefore owed a duty to act solely for its interest. In addition, Mark

would have had knowledge of these activities since he served as assistant treasurer during this time, was privy to Company financial information, and was part of the "J & M" account.

The evidence indicates that the Beardsworth defendants used the Company telephone in their own name and for their own enterprises. Donald took an unauthorized loan from the Company. Donald paid Douglas full-time wages with Company funds for a time period during which Douglas made one phone call and one personal visit. Donald admitted he took commissions for sales to Turco, Inc., which occurred during the time prior to October 1979 when he worked exclusively for the Company. The evidence also indicates that Beardsworth Associates sold delithographed cans from the Company's inventory to Jet Air and collected the sale proceeds as its own.

We conclude that the jury also could determine from the evidence that the defendants were more than mere independent contractors of the Company after the October 1979 agreement with Edward and that their actions were in violation of this agreement. The transactions which both Gregory Associates and Beardsworth Associates entered into with other companies were opportunities which belonged first to the Company. Joseph admitted that his dealings with Malter and his proposal to Tech Spray were in violation of the agreement. The evidence also indicates Beardsworth Associates sold Company inventory and took the proceeds as their own.

If, as defendants contend, Mark and Douglas were not officers, this does not render them outside the purview of breach of fiduciary duty. While it is true that an employee may go so far as to form a rival corporation and outfit it for business while still employed by the prospective competitor, an employee is held accountable for breaching his fiduciary duty to his employer when he goes beyond such preliminary competitive activities and commences business as a rival concern while still employed. (*Radiac Abrasives, Inc. v. Diamond Technology, Inc.* (1988), 177 Ill. App. 3d 628, 637.) An employee need not be an officer or a director to be accountable since an agent must act solely for the principal in all matters related to the agency and refrain from competing with the principal. *Radiac*, 177 Ill. App. 3d at 637.

Joseph and Donald's positions as Company directors rendered them particularly susceptible to breaches of fiduciary duty. While general employees may plan and outfit a competing corporation, but not commence operation, while still working for the employer, a corporate officer stands on different footing and may not hinder the corporation's business. (*Veco Corp.*, 243 Ill. App. 3d at 161.) An officer's duty of loyalty is not inconsistent with his right to enter into competition

with a former employer upon leaving such employment. However, the resignation of the officer will not sever liability for transactions completed after the termination of the person's association with the corporation on transactions which began during the existence of the relationship or were founded on information gained during the relationship. *Veco Corp.*, 243 Ill. App. 3d at 161.

Defendants contend they are not liable for any conduct towards the Company after their termination. Defendants cite *Dangeles v. Muhlenfeld* (1990), 191 Ill. App. 3d 791, which rejected a broad imposition of liability for solicitation of employees where defendants acquired knowledge of the employees' ability and training during their relationship with their employer. (*Dangeles*, 191 Ill. App. 3d at 796.) In that case, the court accepted the view that solicitation of a business' employees by former officers was not actionable. (*Dangeles*, 191 Ill. App. 3d at 796.) Yet, defendants disregard other language in the opinion which states:

> "We are aware *** that resignation of an officer will not sever liability for transactions completed after termination of the party's association with the corporation if the transactions began during the existence of the relationship or were founded on information acquired during the relationship." (*Dangeles*, 191 Ill. App. 3d at 796.)

In *Dangeles*, the plaintiffs made no claim that the defendants solicited customers or employees or engaged in any demonstrable business activity prior to resigning from the plaintiff company; thus, no such breach of fiduciary duty was alleged. (*Dangeles*, 191 Ill. App. 3d at 796.) Accordingly, *Dangeles* does not speak to the bulk of the allegations of breach of fiduciary duty in this case. The core principle of the corporate opportunity doctrine remains that a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets. (*Graham*, 111 Ill. App. 3d at 763.) Given the evidence showing defendants' active exploitation of their fiduciary positions to enhance their individual interests at the expense of the Company, we hold that the jury's verdict on the breach of fiduciary duty claim was not against the manifest weight of the evidence.

The jury also could have determined that Joseph and Donald purposely allowed the Company leases to lapse. In *Comedy Cottage* (145 Ill. App. 3d at 359), defendant managed the daily affairs of a comedy club owned by plaintiff. Defendant was negotiating to obtain a new lease for the business and entered into a month-to-month lease without plaintiff's permission, listing himself as the lessee. The tenancy

was later terminated and defendant resigned his position, negotiated a lease with the landlord, and set up a competing comedy club. Defendant alleged he did not breach his fiduciary duty to the owner because he resigned before engaging in competition. (*Comedy Cottage*, 145 Ill. App. 3d at 359.) However, the reviewing court held that, even if defendant did not begin competing for the lease until after he resigned, he remained bound by his fiduciary duty because his acquisition of the lease was based on knowledge he acquired during his former employment. *Comedy Cottage*, 145 Ill. App. 3d at 361.

Here, the jury could also have rejected Joseph's claim of inadvertence and concluded that Joseph purposely allowed the Company's leasehold to lapse into a month-to-month tenancy while he represented the Company in order to later negotiate a yearly leasehold for his company, LITHO-OFF. Donald also allowed the lease on Delitho East to lapse to a month-to-month tenancy and then in 1981 moved his company, CAN-ERASE, into the premises after Delitho East was evicted. We conclude that defendants were bound by their fiduciary duty not to infringe on business for the Company, and thus affirm the jury's decision on this issue.

### B. TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

■ Defendants also claim that the jury's verdict against them on the claim of tortious interference with plaintiffs' business expectations was erroneous. In order to prove a claim of tortious interference with a business expectancy, plaintiffs must show: (1) the existence of a valid business expectancy by plaintiffs; (2) defendants' knowledge of this expectancy; (3) defendants' intentional and unjustified interference which prevents the realization of the business expectancy; and (4) damage to plaintiffs as a result of the interference. *Mannion v. Stallings & Co.* (1990), 204 Ill. App. 3d 179, 187-88.

Tortious interference requires action toward a third person resulting in such interference. (*Galinski v. Kessler* (1985), 134 Ill. App. 3d 602, 607.) Plaintiffs need not prove the existence of a valid contract, but they must demonstrate the reasonable expectancy of entering into a valid business relationship. (*Mannion*, 204 Ill. App. 3d at 188.) Defendants contend that the alleged diversions of funds here by Gregory Associates, Beardsworth Associates, and the individual defendants were unilateral actions, not toward a third party. Defendants concede that the Malter transaction could support a tortious interference claim, but that plaintiffs failed to prove it had ever dealt with Malter or had a business expectancy with the Company. In short,

defendants contend that any harm to plaintiffs was covered by the claim for breach of fiduciary duty.

■ Here, plaintiffs presented a considerable amount of evidence of the Company's business relationships with a number of companies and their sales persons, defendants' knowledge of these business expectancies, and evidence of damage to the Company as a result of defendants' interference. The record indicates that both the Gregory and Beardsworth defendants diverted potential business from the Clearing House and delitho plants by usurping confidential information and using it to their own advantage. In the Malter transaction, the order came in to the Company, clearly a business expectancy, but the opportunity was diverted by both Joseph and Donald. Similarly, the evidence indicates the Beardsworth defendants also interfered in the Company's sale of de-litho inventory to Jet-Air. These and other transactions indicate defendants' interference with the Company's business expectancy which in turn prevented the expectancy from ripening into a valid business relationship and thereby damaged plaintiffs. We also reject defendants' claim that the verdicts as to the Gregory Associates and Beardsworth Associates as corporate entities were erroneous since the trial court specifically ruled that the companies ratified the conduct of the individuals and their liability is hinged thereto.

Defendants challenge the claim that their interference continued when they took over the properties previously leased by the Company and began their new companies, LITHO-OFF and CAN-ERASE. Defendants again cite *Dangeles* in support of their argument that solicitation of plaintiffs' employees, customers, and suppliers was not actionable. The court there concluded that the plaintiffs could not infer from the fact that its employees started with the defendants' company shortly after leaving plaintiffs' company that defendants enticed the employees away. (See *Dangeles*, 191 Ill. App. 3d at 800.) We acknowledge the holding in *Dangeles* that a former officer may solicit a business' employees and apply personal knowledge and experience gained from the plaintiff employer; however, that is not the issue here. The issue here is whether defendants employed improper means when they interfered with the business relations established between the Company and its customers and employees. The jury could have imposed liability, not simply for soliciting employees and using general information gained during its fiduciary relationship with the Company, but rather for soliciting customers and employees and for using confidential information by *improper means*. Since the jury did so find, defendants cannot claim a "privilege" to compete with the Company. (See *Smith-Schrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 580.) We conclude that the jury's award of damages

for tortious interference was not against the manifest weight of the evidence.

### C. PUNITIVE DAMAGES

Defendants next contend that the punitive damages awarded to plaintiffs were unconstitutional and violated defendants' due process rights as a matter of law. Plaintiffs argue that defendants waived this issue by not raising it in the trial court. However, the record shows that defendants raised the constitutional issues in their motion for leave to file a second amendment to their post-trial motion, which was granted, and defendants discussed the issue in their memorandum in support of their post-trial motion.

■ Plaintiffs also claim that defendants waived this issue by not challenging the prayer for punitive damages on constitutional grounds prior to or during trial and by tendering their own punitive damages instruction later at trial. Defendants made a motion for a directed verdict on punitive damages at trial after presentation of plaintiffs' evidence. Defendants' argument was based on the elements necessary to award punitive damages and argued these elements were not present in this case. Defendants' argument did not contain any constitutional issues. Constitutional questions not presented to the trial court may not be raised for the first time on appeal. *Sheldon v. Edgar* (1985), 131 Ill. App. 3d 489, 495.

However, even if defendants did not waive the constitutional issue, we hold that the imposition of punitive damages was neither unconstitutional nor an abuse of discretion such that a new trial was necessary in the instant case. Defendants contend the jury instruction on punitive damages was infirm in that it failed to advise the jury that awarding such damages was not compulsory. This instruction provided:

> "If you find for the Plaintiff and against one, more than one, or all of the Defendants, on the question of liability under any or all counts and you find that the conduct of one, more than one, or all of the Defendants' [*sic*] was willful and wanton, and if you further believe that justice and the public good require it, you may, in addition to any other damages to which you find the Plaintiff entitled, award an amount which will serve to punish that Defendant or those Defendants and to deter others from the commission of like offenses."

Defendants also tendered a similar punitive damages instruction on their counterclaim against plaintiffs. We do not believe this instruction gave the jury such discretion as to be unconstitutional. The instructions indicated to the jury that such damages were not compulsory, that will-

ful and wanton conduct was required and that they were only to be awarded if the "public good required it." These instructions conformed with those under Illinois law. (Illinois Pattern Jury Instructions, Civil, Nos. 14.01, 35.01 (3d ed. 1990).) We hold that due process was satisfied. See *Pacific Mutual Life Insurance Co. v. Haslip* (1991), 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032.

Further, we do not believe that the punitive damages awarded were erroneous or excessive. The jury here awarded damages to plaintiffs as follows:

### BREACH OF FIDUCIARY DUTY

|  | Compensatory Damages | Punitive Damages |
| --- | --- | --- |
| Joseph Gregory | $66,000 | $30,000 |
| Mark Gregory | $33,000 | $ 5,000 |
| Gregory Associates | $66,000 | $15,000 |
| Donald Beardsworth | $40,800 | $60,000 |
| Douglas Beardsworth | $20,400 | $10,000 |
| D.A. Beardsworth Associates, Inc. | $40,800 | $30,000 |

### TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

|  | Compensatory Damages | Punitive Damages |
| --- | --- | --- |
| Joseph Gregory | $120,000 | $90,000 |
| Mark Gregory | $120,000 | $30,000 |
| Gregory Associates | $120,000 | $30,000 |
| LITHO-OFF, Inc. | $120,000 | $30,000 |
| Donald Beardsworth | $ 80,000 | $60,000 |
| Douglas Beardsworth | $ 80,000 | $20,000 |
| D.A. Beardsworth Associates, Inc. | $ 80,000 | $20,000 |
| CAN-ERASE, Inc. | $ 80,000 | $20,000. |

Punitive damages are intended to punish the wrongdoer and to deter that party, and others, from participating in similar future acts. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203.) Punitive damages are not

favored in the law because of their penal nature; therefore, courts must be cautious in determining that they are not improperly or unwisely awarded. (*Deal*, 127 Ill. 2d at 203.) Punitive damages may be awarded where the tort was committed with fraud, actual malice, deliberate violence or oppression, or where defendant acted willfully or with such gross negligence as to indicate a wanton disregard for the rights of others. *Kochan v. Owens-Corning Fiberglass Corp.* (1993), 242 Ill. App. 3d 781, 793.

The relevant circumstances in reviewing an award of punitive damages include "the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." (*Deal*, 127 Ill. 2d at 204.) Defendants assert that it was erroneous to award punitive damages in the absence of proof of defendants' net worth. However, our supreme court has specifically held:

> "[T]he absence of any evidence regarding [a defendant's] financial status does not mean that the jury's award must be set aside. Evidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages. The plaintiff was not required to present such evidence, and the defendants made no attempt to do so. The defendants cannot now complain of its absence." *Deal*, 127 Ill. 2d at 204-05.

See also *Verdonck v. Scopes* (1992), 226 Ill. App. 3d 484, 491 (a plaintiff who introduces no evidence of the defendant's financial circumstances is not thereby limited to a minimal level of punitive damages).

Moreover, the amount awarded to a plaintiff for punitive damages is a matter for the discretion of the jury. (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 711.) An award of punitive damages will not be disturbed on appeal as being excessive unless it is the result of passion, partiality, or corruption. (*Deal*, 127 Ill. 2d at 204.) Defendants note that there are few clear guidelines in Illinois for determining when a punitive damage award is excessive. However, each case is to be carefully assessed as to the specific facts involved, and the final determination should be governed by the circumstances of each particular case. (*Deal*, 127 Ill. 2d at 204.) In addition, the amount does not have to be proportional to the amount of compensatory damages, and the plaintiffs' attorney fees may be included in the amount of the award. *Hazelwood*, 114 Ill. App. 3d at 711.

The evidence presented at trial indicated that, over the years, defendants breached their fiduciary duty to the Company and tortiously interfered with the Company's business expectancy by solicit-

ing the Company's customers for defendants' own economic advantage. Plaintiffs' expert, Joseph Trindl, testified that his assessment of the total damages in this case was $1,531,350 in the Delitho Division and $355,319 in the Clearing House for a total of $1,886,669. Total damages awarded here were in the amount of $1,517,000. We find nothing to indicate that the jury's assessment of punitive damages in the amounts rendered was excessive. The award is not so high that it indicates passion, partiality, or corruption on the part of the jury, considering the history of harm to the Company. We do not believe that defendants' attempts to compare punitive damage awards in other cases add anything to our analysis.

### D. SEPARATE AWARDS OF DAMAGES

■ Defendants next contend that the jury's return of separate verdicts against the individuals and the corporate entities is a legal impossibility. Plaintiffs argue that defendants waived this issue because it was not included in their post-trial motion. The record, however, indicates this issue was included in paragraph 51 of defendants' post-trial motion and was therefore preserved for review. Plaintiffs further argue that defendants waived this issue by tendering instructions Nos. 12 and 28 which ask the jury to do what they complain of here. Defendants' instruction No. 12 states:

> "The rights of the Defendants in this suit are separate and distinct. You should decide them as if they were separate suits. But, so far as the instructions given you apply to each Defendant, they govern his case." (Withdrawn.)

Defendants' instruction No. 28 states:

> "Each Defendant in this case is entitled to have his, or its, liability, if any, determined separately from every other Defendant." (Given.)

Plaintiffs argue that it was incumbent upon defendants to object to the content of these instructions if they believed they were not consistent with the law, and in failing to do so and tendering the instructions themselves, they have waived any right to object to the jury's execution of the instructions. Defendants attempt to distinguish instructions Nos. 12 and 28 from their argument here by stating that these instructions related to requiring the jury to determine each defendant's *liability* separately. Once the liability was determined, defendants contend, the jury was instructed to find the corporations liable for the *same* conduct as detailed in instruction No. 23, which provides in pertinent part:

"The Defendants are sued both as individuals and as principal and agent. The Defendant Gregory Associates, Inc. is the principal and Joseph Gregory and Mark Gregory are its agent. The Defendant Litho-Off is the principal and Joseph Gregory and Mark Gregory are its agent. The Defendant D.A. Beardsworth Associates, Inc. is the principal and Donald Beardsworth and Douglas Beardsworth are its agent. The Defendant Can Erase, Inc. is the principal and Donald Beardsworth and Douglas Beardsworth are its agent. If you find that the Defendants Joseph Gregory and Mark Gregory are liable under Count I of the Plaintiff's complaint alleging a breach of fiduciary duties, then you must find that the Defendant, Gregory Associates, Inc. is also liable. If you find that the Defendants Donald Beardsworth and Douglas Beardsworth are liable under that Count, then you must find that the Defendant D.A Beardsworth Associates, Inc. is also liable. However, if you find that Joseph Gregory and Mark Gregory are not liable under that count, then you must find that Gregory Associates, Inc. is not liable either. Likewise, if you find that Donald Beardsworth and Douglas Beardsworth are not liable under that count, you must find that D.A. Beardsworth Associates, Inc. is not liable either." (Given over defense counsel's objection.)

This instruction also contains a paragraph with the same language in regard to tortious interference with a business expectancy. The instruction was given after the trial court ruled, as a matter of law, that the corporations, CAN-ERASE, LITHO-OFF, Beardsworth Associates, and Gregory Associates ratified the conduct of Mark Gregory, Joseph Gregory, Donald Beardsworth, and Douglas Beardsworth. We fail to see how this instruction negates defendants' waiver on this issue. Defendants state in their reply brief that separate liability of the corporate defendants is a legal impossibility under the law and the instructions given the jury, yet this is exactly what is stated in instructions Nos. 12 and 28 tendered by defendants. Therefore, we hold that by tendering these instructions defendants have acquiesced to the jury's findings and waived this objection. See *Burnham v. Lewis* (1991), 217 Ill. App. 3d 752, 756.

Assuming, *arguendo*, that defendants had not waived this issue, we believe the separate awards here were not erroneous. The evidence indicates that, prior to the October 1979 agreement, Joseph and Donald worked for the Company as individuals and their commissions earned were to go into the Company accounts. Any breach of fiduciary duty or tortious interference committed would relate to them as

individuals. Gregory Associates and Beardsworth Associates became directly involved with the Company after October 1979. LITHO-OFF and CAN-ERASE were not incorporated until 1981. Therefore, Joseph and Donald were susceptible to additional liability for a longer period of time than the corporate defendants and the jury could find it necessary to apportion damages accordingly. We hold the verdict was supported by the evidence.

### E. DAMAGE EXPERT'S TESTIMONY AS TO LOST PROFITS

Defendants next argue that the trial court erred in denying defendants' motion *in limine* to bar the testimony of plaintiffs' damage expert, Joseph Trindl. Expert testimony is permitted when (1) the opinion is particularly related to a science, profession, business or occupation outside the common knowledge or experience of an average juror; (2) the opinion will aid the juror in the search for truth because the expert has sufficient skill, knowledge, or experience in that field; and (3) the state of the art or scientific knowledge allows the expert to assert a reasonable opinion. (*Suich v. H & B Printing Machinery, Inc.* (1989), 185 Ill. App. 3d 863, 875.) The use of such testimony is within the discretion of the trial court. *Suich*, 185 Ill. App. 3d at 875.

The basis of defendants' motion *in limine* was that: (1) Trindl's testimony of future lost profits was speculative, (2) Trindl falsely assumed that certain conduct of defendants was wrongful, (3) Trindl's opinion of damages included lost profits for conduct which was not wrongful, for example, competition by defendants after May 8, 1981, the day they were terminated from the Company, and (4) Trindl failed to allocate any specific amount of damage to any defendant or groups of defendants.

Trindl testified that he charted the Clearing House sales history from 1975 to 1989. He implemented a benchmark approach to damages by taking the period from 1982-1986 and "racheting" the period back two years to demonstrate that the success in that time period should have also been felt in 1979 through 1985. Assuming sales had stayed the same, he extended the line out to show the "should have been" sales. The difference between these sales and the actual sales for that time period signified the lost sales. Trindl then used "incremental cost" to determine damages. He looked at each individual cost item relevant to the Company and determined how each would react to the increase in sales that the Company should have had. He then added the value of money plus the total loss of profits to arrive at the total damages of $355,319 for the Clearing House.

Trindl used a "linear regression" to chart how the Delitho Division was increasing in sales through the third quarter of 1979 and then suffered a dramatic dropoff. This method allowed him to compare the sales at Delitho from the period of 1974 through the third period of 1979 to the years thereafter where he extended the line out to represent the "should have been sales." He then subtracted actual sales from these sales, and the difference represented the lost sales. Trindl determined that the incremental profit margin for Delitho was 27.3%, assuming sales stayed the same, and applying this to the lost profits plus the cost of money, he arrived at an amount of $1,531,350 for Delitho damages.

The trial court sustained defense counsel's Rule 220 objection to Trindl's apportionment of damages between the Beardsworth and the Gregory defendants. For purposes of this argument, defendants assume that liability is established and the inquiry into profits was proper. Defendants' argument here is based on the amount of lost profits attributable to each defendant. Defendants point out that plaintiffs' consolidated complaint prays for relief "against the defendants, and each of them, in an amount necessary to fully compensate plaintiffs." Plaintiffs formulated their pleadings by splitting the defendants into the Gregory group and the Beardsworth group. Defendants contend the jury improperly apportioned damages amongst the groups of defendants based on Trindl's testimony of one lump sum representing damages to plaintiffs. Further, defendants argue that the trial court's finding as a matter of law that the corporate defendants ratified the actions of the individuals and instruction No. 23 mandate a joint and several liability between the corporate defendants and the individual defendants.

We agree with plaintiffs that the court should not bar an expert's testimony simply because he did not apportion damages between the defendants. Further, plaintiffs' instruction No. 17 clearly informed the jury it was to consider the evidence as against each defendant separately:

"If you decide for the plaintiff on the question of liability, as to one, more than one, or all of the Defendants then you must fix the amount of the money which will reasonably and fairly compensate it for any of the following elements of damages proved to have resulted from the wrongful conduct of that defendant or those defendants."

We believe Trindl's testimony fulfilled the task of assisting the jury in understanding the amount of damages attributable to lost profits at both the Clearing House and Delitho Division. A plaintiff

generally must present competent proof of lost profits from which a reasonable basis of computation can be derived. (*Nordhem v. Harry's Cafe, Inc.* (1988), 175 Ill. App. 3d 392, 396.) "[T]he law requires not absolute certainty as to the amount of loss, but rather that the evidence, with a fair degree of probability, tend to establish a basis for the assessment of damages." (*Nordhem*, 175 Ill. App. 3d at 397.) Moreover, the court in *A B C Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 835, stated:

> "Plaintiff's economic theory provides one viable way of calculating these losses, yet defendants challenged certain underlying assumptions of that calculation. That the [trier of fact] might have accepted plaintiff's position is certainly a different assertion than that it was compelled to do so. Economic data can be interpreted in different ways for different purposes. As useful as a particular accounting technique may be ***, it cannot be regarded as conclusive proof of legal damages; the judge or jury must be free to draw their own inferences from the evidence presented."

■ Plaintiffs here provided the jury with a considerable amount of evidence intended to prove wrongful conduct of the various defendants. Trindl's testimony contributed calculations as to lost sales and lost profits and the jury was asked to decide how much of this information was actually proven. His opinion was made according to accepted financial practice. While his opinion may contain some uncertainty, we do not believe it was sheer speculation. The amount of damages indicates the jury did not accept all of the damage amounts computed by Trindl, which suggests it did not blindly follow his conclusions to achieve the same damage total. We hold the trial court did not err in allowing Trindl's testimony.

### F. JURY INSTRUCTIONS

■ Defendants next contend that several of the jury instructions were prejudicial and erroneous. First, defendants argue that the issues instruction was erroneous since it consisted of 13 pages, 2169 words, and 50 paragraphs which are essentially taken from plaintiffs' complaint and affirmative defense or consist of plaintiffs' views of the evidence. Plaintiffs allege defendants never objected to the instruction on the basis put forward on appeal and thus this issue is waived. The record indicates that defendants objected to the instruction on these issues and the issue was not waived.

An issues instruction explains to the jury the points in controversy and thereby simplifies the jury's application of the law to the

facts. (*Lewis v. Cotton Belt Route-St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 112.) An issues instruction is proper so long as it is succinctly stated without undue repetition or undue emphasis. (*Schulz v. Rockwell Manufacturing Co.* (1982), 108 Ill. App. 3d 113, 119.) Defendants cite *Signa v. Alluri* (1953), 351 Ill. App. 11, as support that the instruction here was erroneous. However, the facts in *Signa* are distinguishable. There, the appellate court held that the practice of reading the entire complaint as an instruction to the jury constituted prejudicial error. The court noted that the sheer length of such an instruction could confuse a jury, but more important was the inequity of putting the one-sided version of a lawsuit into the mouth of the trial court. (*Signa*, 351 Ill. App. at 20.) We hold that, given the complexities of the issues in this case, the amount of testimony, and the numerous defendants, the instruction was not erroneous as to its length. The instruction contains some repetition, but this is due in part to the fact that the same acts were alleged as evidence of both breach of fiduciary duty and tortious interference with business expectancy. We hold this instruction was not erroneous.

▮▮ Defendants next contend that instruction No. 23, which directed the jury to find the corporate defendants liable if the individual defendants are liable, was erroneous. Again, plaintiffs are in error in stating that defendants have waived this issue. Defendants did object to this instruction; however, we find this instruction properly explained the trial court's finding that the corporate defendants had ratified the conduct of their individual owners.

▮▮ Defendants next allege that instructions Nos. 7, 26, 27, and 28 are repetitious and place undue emphasis on the definition of a fiduciary. The record indicates instruction No. 7 was objected to on another basis and is therefore waived (*Deal*, 127 Ill. 2d at 202-03), and plaintiffs admit they did not object to instruction No. 26. The remaining two instructions are not unduly repetitious on this issue given the amount of jury instructions and the fact that the definition of a fiduciary is integral to the jury's understanding of the case.

▮▮ Defendants next contend that their instructions Nos. 15, 16, 16(a), 18, and 29, were improperly refused or modified and thereby prevented the jury from being instructed as to the defendants' theory of the case. We first note that defendants did not object to the modified version of No. 29, and that instruction is waived. (*Deal*, 127 Ill. 2d at 202-03.) Defendants' instructions Nos. 15, 16, 16(a), and 18 all concern whether defendants were privileged to interfere with the continuation of a business relationship between plaintiffs and their customers and lessors of their delitho premises. Instructions Nos. 15 and

16 were refused. Instruction No. 16(a) was tendered and modified by adding the date May 11, 1981, that being the date defendants were fired. We believe this instruction better conforms to the law regarding privilege to interfere with a business relationship. (See *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 291.) We also believe instruction No. 18 as modified clarified to the jury when a former employee may solicit his former employer's customers; therefore, we conclude these instructions were not in error.

### III. COUNTERPETITIONS ON BREACH OF AGREEMENT

■■ Defendants claim that the trial court erred in denying their motion for judgment notwithstanding the verdict on the counterclaim. In accordance with the *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, standard of review, judgments *n.o.v.* should be entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. (*Pedrick*, 37 Ill. 2d at 510.) The Gregory defendants first argue that plaintiffs breached the December 4, 1974, agreement wherein Joseph and Edward entered into a partnership to purchase the delitho equipment and lease it to the Company for which $200 a month was to be paid to Joseph and Edward. Joseph argues he never received these payments nor did he receive payment for his one-half interest in the equipment. The jury awarded Joseph $5,400 under this claim. Defendants contend this amount was inadequate and offer as support a letter dated February 11, 1981, from Edward to Joseph which admitted that the $200 payments had not been made and that the total due was $16,800. The testimony at trial established that the equipment was worth $11,000 to $12,000 when it was purchased in the early 1970's and would since have diminished considerably in value.

On the issue of Joseph's $200-a-month compensation, we reject plaintiffs' argument that there was no evidence that this agreement was renewed since Edward admitted at trial that "[t]his document is renewable so it was renewed." Edward testified that Joseph had not, to his knowledge, paid himself the $200 per month pursuant to the agreement. We hold the amount awarded to Joseph was inadequate to pay for the $200-a-month compensation due under the agreement. We therefore remand this part of the cause for hearing on the amount due to Joseph.

■■ The Gregory and Beardsworth defendants next claim that Edward breached the October 1979 agreement concerning the percentage of profits due from the delitho operations. Defendants claim

that the total amount due to Gregory Associates through earnings from 1979 to 1981 is $121,547.72. The total amount claimed due to Beardsworth Associates, after subtracting payments and personal loans, is $24,949. Defendants cite *Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14, for the proposition that defendants are due compensation from the Company since the specific work contracted for in the October 1979 agreement was in fact performed by defendants to the benefit of plaintiffs. In *Monotronics Corp.*, the court determined full forfeiture was inappropriate because the employee continued to work diligently for the employer during the period he was setting up a competing business. However, the record contained evidence tending to show the employer had acquiesced in the employee's competitive activity in addition to the fact that the employer benefited from the employee's performance. (*Monotronics Corp.*, 107 Ill. App. 3d at 19.) No such acquiescence was apparent here. To the contrary, plaintiffs were unaware of the breach of fiduciary duty committed by both the Gregory and Beardsworth defendants. In addition, it cannot be said that the Company benefited substantially from defendants' continued employment when the evidence shows that defendants diverted business from the Company and committed other actions to the detriment of the Company. We affirm the jury's decision on this counterclaim.

### IV. PLAINTIFFS' APPEAL ON PATENT OWNERSHIP

Plaintiffs argue that the trial court erred in denying them a trial by jury on the patent ownership claim on the delitho process. Plaintiffs' original petition filed in 1981 asked for injunctive relief and other equitable remedies but did not address ownership of the patents. Plaintiffs filed their consolidated complaint for equitable and legal remedies in August 1984 and requested a jury trial on the patent ownership rights that same day. Judge Teschner ordered on January 3, 1985, that the issue of ownership of the patents would be heard by the court.

Plaintiffs argue that the court erred in its ruling since, prior to August 1984, the Company asserted no legal claims on which a jury demand would have been permitted and therefore the filing of plaintiffs' jury demand was timely and proper. We first note, as defendants correctly point out, that plaintiffs included their claims as to the ownership of the patents in the section requesting equitable relief in the consolidated complaint. Specifically, plaintiffs prayed for: "an order declaring that the E.J. McKernan Company is the owner of all right, title and interest now being asserted by the respondents in U.S. Pat-

ent No. 3, 801, 369 and its invention and any and all foreign patents or patent applications relating to the invention."

We note Supreme Court Rule 135(b) provides that when actions at law and in chancery are joined, the party joining the actions may, if he desires to treat them as separate causes of action, plead them in distinct counts marked " 'separate action at law' and 'separate action in chancery.' " (134 Ill. 2d R. 135(b).) Supreme Court Rule 232(a) provides that when legal and equitable matters that may be asserted separately are pleaded as in Rule 135, the court shall determine whether the matters joined are severable and, if so, whether they shall be tried together or separately. (134 Ill. 2d R. 232(a).) Rule 232(b) states further that where the court determines that the matters are severable, "[t]he equitable issues shall be heard and decided in the manner heretofore practiced in courts of equity." 134 Ill. 2d R. 232(b).

A trial by jury on equitable issues is a matter of discretion and not of right. (*First State Bank v. Leffelman* (1988), 167 Ill. App. 3d 362, 366.) We conclude the trial court did not abuse its discretion in ordering a bench trial on this issue.

Plaintiffs next contend that the trial court's finding of patent ownership in the name of Joseph and Edward individually was against the manifest weight of the evidence. A reviewing court cannot substitute its opinion for that of the trier of fact unless the holding is contrary to the manifest weight of the evidence. *Heath v. Zenkich* (1989), 184 Ill. App. 3d 761, 768.

The history of litigation involving employer-employee rights in inventions indicates that, absent a specific agreement, an employer's rights arise from the inventor's employment status. Those inventions made by an employee "employed to invent" are typically the property of the employer, while those made by other employees in "general employment" of a noninventive nature, using the employer's property, are typically property of the employee but subject to a nontransferable shop right in favor of the employer. (See *Solomons v. United States* (1890), 137 U.S. 342, 34 L. Ed. 667, 11 S. Ct. 88; see also *Heath*, 184 Ill. App. 3d at 767 (an employer who hires someone for consideration to devote his time to developing a product becomes the owner of that property which is developed and of any invention incident to it).) Further, the employer must show that he had an idea of the means to accomplish the desired result of the invention and that he communicated that means in such detail to the employee that the employee was able to develop the idea into a practical form. *Heath*, 184 Ill. App. 3d at 767.

We disagree with plaintiffs' contention that Joseph was not initially hired specifically to invent, but that this assignment "naturally evolved" from his position within the Company. The record indicates that Joseph was not hired to pursue his creative instincts, and the delitho process which he studied and formulated for use by the Company was not at the initial direction of Edward or the Company. Rather, his perfection of the delitho process for the Company evolved from his own desire to make the Company more profitable. We hold the trial court did not abuse its discretion in finding ownership of the patents with Joseph and Edward individually.

Plaintiffs' last contention is that the trial court erred in denying the plaintiffs' motion for attorney fees. Illinois law provides that sufficient grounds for an award of attorney fees are present where a plaintiff has shown that a defendant acted intentionally and without just cause. (*Smith-Schrader*, 136 Ill. App. 3d at 580.) However, we also recognize that attorney fees may be included in the amount of a punitive damages award. (*Hazelwood*, 114 Ill. App. 3d at 711.) Moreover, attorney fees cannot be awarded as a separate entity distinct from punitive damages, barring a statutory provision specifically authorizing an award of such fees. (*Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 683; *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 582.) We hold the trial court did not err in refusing the plaintiffs an award of attorney fees.

For the foregoing reasons, we affirm in part and reverse in part the trial court's judgment and remand this cause for further hearing on the issue of compensation to Joseph for rental of the delitho equipment.

Affirmed in part; reversed in part and remanded.

INGLIS, P.J., and DOYLE, J., concur.